# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

RIVERKEEPER, INC.,

   Plaintiff,

v.

COEYMANS RECYCLING CENTER LLC,
COEYMANS RECYCLING CENTER II, LLC, and
CARVER LARAWAY,

   Defendants.

---

Case No. __1:20-CV-1025 (GTS/CFH)__

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387)

---

Plaintiff Riverkeeper, Inc. ("Riverkeeper"), by and through its counsel, hereby alleges:

## I.

## INTRODUCTION

1. This action is brought under the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act"), to address and abate Defendants' ongoing and continuous violations of the Act.

2. Defendants discharge polluted industrial stormwater from an industrial park located in the Village of Ravena and the Town of Coeymans, New York (the "Industrial Park") into Coeymans Creek in violation of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and the New York State Department of Environmental Conservation SPDES Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity, Permit No. GP-0-17-004 (March 1, 2018), https://www.dec.ny.gov/docs/water_pdf/msgppermit.pdf ("General Permit").

3.　　　Defendants violate CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and the General Permit by discharging polluted industrial stormwater from multiple unpermitted outfalls to Coeymans Creek and its tributaries; failing to adhere to adequate stormwater pollution prevention and management practices; failing to comply with the General Permit's monitoring, recordkeeping, and reporting requirements; and discharging stormwater that causes or contributes to violations of water quality standards in Coeymans Creek and its tributaries.

4.　　　Stormwater runoff is one of the most significant sources of water pollution in the nation—comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted stormwater pour into Coeymans Creek and other receiving waters in this District.  The State of New York has designated as "impaired" more than 7,000 river miles; 319,000 acres of larger waterbodies; 940 square miles of harbors, bays, and estuaries; 10 miles of coastal shoreline; and 592 miles of Great Lakes shoreline.  Under the Clean Water Act, "impaired" means not meeting a state's water quality standards and/or unable to support beneficial uses, such as fish habitat and water contact recreation.  In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded.  For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

5.　　　Defendants' stormwater discharges contribute to this endemic stormwater pollution problem.  At the Industrial Park, Defendants own and manage properties on which numerous industrial activities occur.  Defendants' tenants engage in industrial activities such as

warehousing, vehicle maintenance, a range of recycling operations, and other industrial activities.  Defendants themselves engage in industrial activities at the Industrial Park as well, including recycling and processing of construction and demolition debris; storage of salt, lime, and gypsum; processing and drying of unconditioned fly ash; vehicle and equipment maintenance; and recycling of concrete aggregate.  As precipitation comes into contact with pollutants generated by these industrial activities, it conveys those pollutants to nearby waters. Contaminated stormwater discharges such as those from the Industrial Park can and must be controlled to the fullest extent required by law in order to allow these water bodies a fighting chance to regain their health.

## II.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over the parties and this action pursuant to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

7.     On May 12, 2020, Riverkeeper provided notice of Defendants' violations of the Clean Water Act and of its intention to file suit against Defendants to Defendants; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the Commissioner of the New York Department of Environmental Conservation ("DEC"), as required by the Act under CWA Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3.  A true and

3

correct copy of Riverkeeper's notice letter is attached as Exhibit A, and is incorporated herein by reference.

8.      More than sixty days have passed since the notice letter was served on Defendants and the State and federal agencies.  Riverkeeper has complied with the Act's notice requirements under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

9.      Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint.  *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

10.     This action is not barred by any prior administrative penalty action under CWA Section 309(g), 33 U.S.C. § 1319(g).

11.     Venue is proper in the United States District Court for the Northern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations is located within this judicial district.

## III.

## PARTIES

12.     Riverkeeper, Inc. is a not-for-profit environmental organization organized under the laws of the state of New York, with its principal place of business in Ossining, New York. Riverkeeper's mission includes safeguarding the ecological and biological integrity of the Hudson River and its tributaries.  Riverkeeper was originally founded by the Hudson River Fisherman's Association, a group of fishermen concerned about the ecological state of the Hudson River, and the effect of its polluted and degraded condition on fish. Riverkeeper achieves its mission through public education, advocacy for sound public policies and participation in legal and administrative forums. Riverkeeper has more than 3,400 members,

4

including a number of members that live in close proximity to Coeymans Creek, which is polluted by industrial stormwater runoff from the Defendants' Industrial Park.

13.    Riverkeeper's members reside near to, use, and enjoy the waters which Defendants have unlawfully polluted and are unlawfully polluting.  Riverkeeper's members use those areas to fish, crab, sail, boat, canoe, kayak, swim, birdwatch, photograph, observe wildlife, engage in spiritual meditation, and engage in nature study and scientific study, among other activities.  Defendants' discharges of stormwater associated with industrial activity containing pollutants impair each of those uses.  Thus, the interests of Riverkeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA and the General Permit.

14.    The relief sought herein will redress the harms to Riverkeeper and its members caused by Defendants' activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Riverkeeper and its members, for which harm they have no plain, speedy, or adequate remedy at law.

15.    Riverkeeper brings this action on behalf of itself and its members.  Riverkeeper's interest in reducing Defendants' discharges of pollutants into Coeymans Creek and requiring Defendants to comply with the requirements of the General Permit are germane to Riverkeeper's purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of Riverkeeper.

16.    Riverkeeper is informed and believes, and thereupon alleges, that Defendant Coeymans Recycling Center, LLC is a corporation, incorporated under the laws of the State of New York, that operates the Industrial Park.

17.    Riverkeeper is informed and believes, and thereupon alleges, that Defendant

Coeymans Recycling Center II, LLC is a corporation, incorporated under the laws of the State of New York, that participates in operation of a portion of the Industrial Park.

18.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Carver Laraway is an individual residing in the State of New York who controlled the development and design of the Industrial Park, controls the other Defendants, and participates in operation of the Industrial Park.

## IV.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

19.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA § 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

20.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.  A NPDES permit requires dischargers of pollution to comply with various limitations.

21.     NPDES permits are issued by the United States Environmental Protection Agency ("EPA") or by states that have been authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

22.     In New York, DEC has been delegated the authority to issue NPDES permits. Such state-issued permits, issued by DEC pursuant to its delegated authority from EPA under the Clean Water Act, are referred to as "SPDES" permits.

**Stormwater Permits**

23.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

24.     Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.

25.     In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

26.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

**New York's General Permit for the Discharge
of Stormwater Associated with Industrial Activity**

27.     As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  *SPDES Multi-Sector General Permit For Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-17-004, N.Y. DEP'T ENVTL. CONSERVATION (Mar. 1, 2018) ("General Permit").  DEC also has the authority to issue SPDES permits for individual applicants.

28.     Under the General Permit, permittees must comply with federal technology-based standards.  The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).   In turn, the Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants (i.e. most pollutants), permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . . ."  33 U.S.C. § 1311(b)(2)(A).   The Act also sets a different standard, "application of the best conventional pollutant control technology" for a defined set of five "conventional pollutants".  Id. § 1311(b)(2)(E).[1] *See also* 40 C.F.R. § 122.44(a) (requiring that each NPDES permit shall include conditions that meet the Act's technology-based standards).

29.     Accordingly, as a state-issued, delegated NPDES permit, the General Permit requires permittees to use measures that reflect, and prohibits the discharge of pollutants above the level commensurate with, application of the best available technology economically achievable ("BAT") standards for toxic and non-conventional pollutants and best conventional pollutant control technology ("BCT") standards for conventional pollutants.  *See* General Permit Part II (requiring permittees to minimize pollution by adopting measures that are "technologically available and economically practicable and achievable in light of best industry practice.").

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40 CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

30. The General Permit also ensures compliance with state water quality standards. The Clean Water Act requires that any NPDES permit issued by a state contain any further limits necessary to ensure compliance with a state's water quality standards. *See* 33 U.S.C. §§ 1311(b)(2)(c) (requiring achievement of "any more stringent limitation, including those necessary to meet water quality standards") and 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311). *See also* 40 C.F.R. § 122.44(d) (requiring that each NPDES permit shall include any conditions necessary to achieve a state's water quality standards).

31. Accordingly, as a state-issued, delegated NPDES permit, the General Permit prohibits permittees from causing or contributing to violations of water quality standards. See General Permit Part II.C.1.a ("It shall be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700-705."); II.C.1.c ("In all cases, any discharge which contains a visible sheen, foam, or odor, or may cause or contribute to a violation of water quality is prohibited.").

**The General Permit Framework**

32. The General Permit ensures compliance with federal technology and water-quality based requirements by imposing a variety of conditions.  All of the General Permit's conditions constitute enforceable "effluent standards or limitations" within the meaning of the Clean Water Act's citizen suit provision.  *See* 33 U.S.C. § 1365(f) (defining enforceable effluent standards or limitations to include "a permit or condition of a permit issued under section 1342 of this title[.]").

33. At the outset, the General Permit establishes eligibility conditions that Permittees must meet in order to obtain coverage.  General Permit, Part I.  Permittees apply for coverage

under the General Permit by submitting an application called a Notice of Intent.  General Permit, Part I.D.

34.     Among other things, when submitting a Notice of Intent the applicant must identify the specific outfalls through which it will discharge industrial stormwater.  A permittee may only lawfully discharge stormwater associated with industrial activity from these outfalls. General Permit, Parts I.D.3 and I.F.

35.     Next, the General Permit also contains a variety of substantive limits that all permittees must meet (see General Permit Part II).  These include numeric effluent limitations on the quantity and concentration of pollutants, narrative effluent limitations on pollutants, and narrative effluent limitations that impose compulsory pollution control and minimization practices.  *See* General Permit, Part II.

36.     In addition, the General Permit contains effluent limitations that apply only to permittees engaged in particular industrial activities. *See* General Permit, Part VII.  Although permittees may have a primary industrial activity occurring at their site, they are required to comply with all conditions of the General Permit pertaining to any other industrial activities occurring at their facility too, referred to as "co-located" activities.  *Id.*  ("Stormwater discharges from co-located industrial activities are authorized by this permit, provided that the owner or operator complies with any and all of the requirements applicable to each industrial activity at the facility.").

37.     Permittees typically meet the General Permit's applicable technology and water-quality based effluent limitations (whether those limits are phrased narratively or numerically) by adopting "best management practices" ("BMPs") and other stormwater control measures.  *See* General Permit Part II.  BMPs and control measures include changes to industrial practices and

10

activities (for example, housekeeping schedules and employee training programs) and structural improvements (for example, roofing to minimize exposure of pollutants, or collection basins that reduce the volume of stormwater discharged from the facility).  The permittee must select, design, install, and implement control measures, including BMPs, in accordance with good engineering practices, to meet the effluent limits contained in the General Permit.  General Permit, Part II, Part III.A.7.

38.     A permittee must record the BMPs and controls measures used to meet the General Permit's limits in a "stormwater pollution prevention plan" ("SWPPP").  General Permit, Part III.  The owner or operator must develop, implement, and continually update the plan. General Permit, Part III.

39.     Further, permittees must track, improve upon and report upon their performance under the General Permit.  The General Permit requires regular inspections, monitoring and sampling of stormwater discharges, periodic reporting, and corrective action to reduce pollution when necessary. *See* General Permit Parts IV–VI.

40.     The General Permit also relies centrally on comparing the pollution found in a permittee's stormwater to "benchmark monitoring cutoff concentrations" (benchmarks) for each pollutant, in order to ensure that permittees are complying with the limits set forth in the General Permit.  *See* General Permit, Part VII (adopting sector-specific benchmarks for each category of permittees).

41.     A benchmark is "a guideline for the owner or operator to determine the overall effectiveness of the SWPPP in controlling the discharge of pollutants to receiving waters." General Permit, Appendix A.  As the EPA explained in adopting benchmarks originally, they "provide a reasonable target for controlling storm water contamination by pollution prevention

plans." 60 Fed. Reg. 50804, 51076 (Sept. 29, 1995). Further, benchmark exceedances can indicate that "a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish." 60 Fed. Reg. at 50824–25.

42.     Thus, the benchmarks provide strong evidence of whether a facility has implemented adequate control measures and BMPs to comply with the General Permit and the federal technology and water-quality based standards that it implements. Although compliance with benchmarks under the General Permit is self-reported, self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), *vacated on other grounds*, 485 U.S. 931 (1988).

## Key Conditions of the General Permit

43.     Within that framework, the following specific conditions of the General Permit are particularly relevant in this case.

44.     The General Permit prohibits any discharge that may cause or contribute to a violation of New York's water quality standards.  General Permit, Part II.C.1.c.

45.     Defendants' SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with industrial activity.  Further, the SWPPP must describe and ensure the implementation of practices that minimize the discharge of pollutants in these discharges and that assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.  General Permit, Part III.A.

46.     Among other things, the SWPPP must include: information related to a discharger's stormwater pollution prevention team; a general site description; a summary of potential pollutant sources; measures related to handling of spills and releases; a general location map and a site map identifying the location of the facility and all receiving waters to which

12

stormwater discharges; a description of control measures and best management practices; schedules and procedures for implementation of control measures, monitoring and sampling, and inspections; and documentation of inspections, samples, and corrective actions taken at a facility. General Permit, Part III.A.

47.     Part VII of the General Permit also imposes other requirements on Defendants, including but not limited to the following: annual training (at a minimum) that covers good housekeeping practices, confining vehicles awaiting maintenance with actual or potential leaks to designated areas, cleaning pavement surface to remove oil and grease, consideration of more frequent sweeping than other industrial facilities; good housekeeping measures to prevent accumulation of particulate matter; consideration of indoor storage of recyclable materials; diversion of runoff; and covering containers and dumpsters.  General Permit, Part VII.

48.     Part IV of the General Permit obliges industrial dischargers to conduct an annual comprehensive site inspection of a facility that includes evaluation of areas where industrial materials or activities are exposed to precipitation or where spills and leaks have occurred within the past three years.  General Permit, Part IV.A.1.  The inspection must ensure that all stormwater discharges are adequately controlled and that all BMPs are functioning as expected. Records of this inspection must be kept for five years.  General Permit, Part IV.A.2.

49.     In addition, qualified facility personnel must carry out routine inspections at least quarterly.  General Permit, Part IV.B.  During these inspections, personnel must evaluate conditions and maintenance needs of stormwater management devices, detect leaks and ensure the good condition of containers, evaluate the performance of the existing stormwater BMPs described in the SWPPP, and document any deficiencies in the implementation and/or adequacy of the SWPPP.  Such deficiencies must then be addressed through corrective actions.  General

13

Permit, Part V.

50.     The General Permit requires industrial dischargers to monitor their facilities, sample discharges, and submit complete and accurate reports to DEC.  General Permit, Parts IV, VI, Appendices H.8.g, H.9.  The required reporting includes an annual report and periodic discharge monitoring reports.  General Permit, Part VI.A.1 and A.2.  Additionally, when there is an exceedance of a numeric effluent limit or of a benchmark that applies to the impairing pollutant discharged to an impaired waterbody, a discharger must report on the exceedance event and corrective actions taken in response.  General Permit, Part VI.A.2(b).

### New York's General Permit for Stormwater Discharges Associated with Construction Activity

51.     As a delegated state NPDES permitting agency, DEC has also elected to issue a statewide general permit for stormwater discharges associated with construction activity in New York.  *SPDES General Permit for Stormwater Discharges from Construction Activity*, Permit No. GP-0-20-001, N.Y. DEP'T ENVTL. CONSERVATION (Jan. 29, 2020) ("Construction Permit").  DEC also has the authority to issue SPDES permits for individual applicants.

52.     Under the Construction Permit, permittees must comply with federal technology-based standards.  The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).   In turn, the Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants (i.e. most pollutants), permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . . ."  33 U.S.C.

§ 1311(b)(2)(A).   The Act also sets a different standard, "application of the best conventional pollutant control technology" for a defined set of five "conventional pollutants".   Id. § 1311(b)(2)(E).[2] *See also* 40 C.F.R. § 122.44(a) (requiring that each NPDES permit shall include conditions that meet the Act's technology-based standards).

53.   Accordingly, as a state-issued, delegated NPDES permit, the Construction Permit requires permittees to use measures that reflect, and prohibits the discharge of pollutants above the level commensurate with, application of the best available technology economically achievable ("BAT") standards for toxic and non-conventional pollutants and best conventional pollutant control technology ("BCT") standards for conventional pollutants.   *See* Construction Permit Part I.B.1 (requiring permittees to "minimize the discharge of pollutants"); Construction Permit Appendix A (defining "minimize" as "reduce and/or eliminate to the extent achievable using control measures (including best management practices) that are technologically available and economically practicable and achievable in light of best industry practices").

54.   The Construction Permit also ensures compliance with state water quality standards.   The CWA requires that any NPDES permit issued by a state contain any further limits necessary to ensure compliance with a state's water quality standards. *See* 33 U.S.C. §§ 1311(b)(2)(c) (requiring achievement of "any more stringent limitation, including those necessary to meet water quality standards") and 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311). *See also* 40 C.F.R. § 122.44(d) (requiring that each NPDES permit shall include any conditions necessary to achieve a state's water quality standards); Construction Permit Part I.B.1. (requiring permittees to "prevent a violation of water

---

[2] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40 CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

quality standards").

55.     Accordingly, as a state-issued, delegated NPDES permit, the Construction Permit

prohibits permittees from causing or contributing to violations of water quality standards.

Construction Permit Part I.D ("It shall be a violation of the ECL for any discharge to either cause

or contribute to a violation of water quality standards as contained in Parts 700 through 705 of

Title 6 of the [N.Y.C.R.R.].").

### The Construction Permit Framework

56.     The Construction Permit ensures compliance with federal technology and water-

quality based requirements by imposing a variety of conditions.  All of the Construction Permit's

conditions constitute enforceable "effluent standards or limitations" within the meaning of the

Clean Water Act's citizen suit provision.  *See* 33 U.S.C. § 1365(f) (defining enforceable effluent

standards or limitations to include "a permit or condition of a permit issued under section 1342

of this title[.]").

57.     The Construction Permit establishes eligibility conditions that Permittees must

meet in order to obtain coverage.  Construction Permit, Part II.  A permit only goes into effect

when: (a) project review pursuant to the State Environmental Quality Review Act has been

satisfied; (b) the Uniform Procedures Act has been complied with; (c) a final Stormwater

Pollution Prevention Plan ("SWPPP") has been prepared; and (d) a complete Notice of Intent has

been submitted to DEC.  Construction Permit, Part II.C.2.  A construction activity may only

commence after the permit goes into effect.  Construction Permit, Part II.C.1.

58.     Among other things, when submitting a Notice of Intent the applicant must

identify the specific areas that will be disturbed with construction activity.  A permittee may only

lawfully discharge stormwater associated with construction activity from these areas.

Construction Permit, Part II.C.4.

16

59.     The Construction Permit contains a variety of substantive requirements that all permittees must meet during construction.  Construction Permit, Part I.B.  These include erosion and sediment controls, soil stabilization, control of dewatering activities, control of surface outfalls, and other pollution prevention measures.  Construction Permit, Part I.B.1.a–d, f.  There are also several prohibited discharges under the Construction Permit, Part I.B.1.e.

60.     In addition, the Construction Permit imposes a variety of substantive requirements that certain permittees must meet after construction, including industrial parks.  Construction Permit, Parts I.C, III.C, Appendix B Table 2.  Following construction, the permittee must select, design, install, and maintain practices in accordance with the New York State Stormwater Management Design Manual and sound engineering judgment to manage stormwater discharges following the completion of construction activity.  Construction Permit, Part I.C.

61.     Finally, the Construction Permit requires permittees to control discharges sufficiently to meet water quality standards.  Construction Permit, Part I.D.  The Permit specifically forbids: increases in turbidity that will cause a visible contrast to natural conditions; increases in suspended or settleable solids that cause deposition or "impair the waters for their best usages;" and residue from oil or floating substances.  Construction Permit, Part I.D. (citing 6 N.Y.C.R.R. §§ 700–705).

62.     Permittees typically meet the Construction Permit's effluent limitations by adopting "best management practices" ("BMPs") and other stormwater control measures.  *See* Construction Permit, Part I.B.1 (requiring permittees to "minimize the discharge of pollutants"); Construction Permit, Appendix A (defining "minimize" as "reduce and/or eliminate to the extent achievable using control measures (including best management practices) that are technologically available and economically practicable and achievable in light of best industry

17

practices"). The permittee must select, design, install, and implement control measures, including BMPs, in accordance with the New York State Standards and Specifications for Erosion and Sediment Control and sound engineering judgment. Construction Permit, Part I.B.1.

63. A permittee must record the BMPs and controls measures used to meet the Construction Permit's effluent limitations in a "stormwater pollution prevention plan" ("SWPPP"). Construction Permit, Part III. The owner or operator must develop, implement, and continually update the plan so that it "at all times accurately documents the erosion and sediment controls practices that are being used or will be used during construction, and all post-construction stormwater management practices that will be constructed on the site." Construction Permit, Part III.A.4.

64. Further, permittees must track and improve upon their performance under the Construction Permit. The Construction Permit requires regular inspections and corrective action to reduce pollution when necessary. Construction Permit, Part IV. Inspection reports must be retained for at least five years from the date DEC receives a notice of termination (i.e., after total project completion) and provided to DEC upon request. Construction Permit, Part VI.

## Beneficial Uses of New York Surface Waters

65. The DEC has classified the portion of Coeymans Creek where the Industrial Park discharges as a class C(TS) water. 6 N.Y.C.C.R. § 863.6.

66. Under New York's Water Quality Standards, a waterbody that is designated Class C is meant to be suitable for fishing and for fish, shellfish, and wildlife survival, as well as for potential use for primary and secondary contact recreation. 6 N.Y.C.R.R. § 701.8.

67. New York's water quality standards also set numeric and narrative criteria for different water pollution parameters including dissolved oxygen, oil and grease, suspended and settleable solids, bacteria (pathogens), pH, temperature, nutrients, and hundreds of others. *See*

18

*generally* 6 N.Y.C.R.R. §§ 702, 703 (outlining quantitative and qualitative standards, respectively).   A waterbody must meet these numeric and narrative criteria in order to support its designated uses.  *See id.* §§ 702.2, 702.9.

68.     In addition to those general Class C requirements, DEC has specific requirements for (TS) waters.  Under New York's Water Quality Standards, a waterbody that is designated as (TS) must be kept suitable for trout habitat and trout spawning.  6 N.Y.C.R.R. § 701.25(b).

69.     DEC stocks Onesquethaw Creek—an upstream tributary to Coeymans Creek— with brown trout (*Salmo trutta*).

70.     Under New York regulations for the Hudson River and its tributaries in Albany County, the term "trout" includes the genera *Coregonus*, *Oncorhynchus*, *Prosopium*, *Salmo*, *Salvelinus*, and *Thymallus*.  6 N.Y.C.R.R. § 863.3(i).

71.     Trout and trout spawning waters require a higher dissolved oxygen content and a lower nitrite content.  6 N.Y.C.R.R. §§ 863.3(h); 703.3; 703.5.

72.     Class (TS) waters must provide habitat in which "trout can survive and grow within a normal range on a year-round basis." 6 N.Y.C.R.R. § 700.1(a)(67).

73.     Class (TS) waters are also defined as "waters in which trout eggs can be deposited and be fertilized by trout inhabiting such waters (or connecting waters) and in which those eggs can develop and hatch, and the trout hatched therefrom could survive and grow to a sufficient size and stage of development to enable them to either remain and grow to adult trout therein, or migrate into and survive in other trout waters."  6 N.Y.C.R.R. § 700.1(a)(68).

74.     Trout are extremely sensitive to some metals, particularly copper, even at extremely low levels. Discharges of metals at concentrations that interfere with any trout life functions impair these waters.

19

75.     Additionally, there is a dissolved solids standard that applies to all class C waters, including C(TS) waters: "as low as practicable to maintain the best usage of waters but in no case shall it exceed 500 mg/L." 6 N.Y.C.R.R. § 703.3.

76.     The best usage of a C(TS) water is trout spawning.

77.     Thus, dissolved solids in Coeymans Creek and its tributaries must be kept as low as practicable to maintain trout spawning and in no case can dissolved solids exceed 500 mg/L in these waters.

78.     Chloride and sodium are major contributors to dissolved solids. Therefore, if a water sample from Coeymans Creek or its tributaries contains chloride or sodium at levels that harm trout spawning, or if it exceeds 500mg/L of chloride or sodium, it also violates the dissolved solids standard.

79.     The trout spawning habitat in Coeymans Creek depends on both general and trout-specific water quality requirements being met.

## CWA Citizen Enforcement Suits

80.     Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

81.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.  CWA Section 505(f), 33 U.S.C. § 1365(f).

82.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

83.     Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

84.     Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation for violations occurring before November 2, 2015 and up to $55,800 per day per violation for violations occurring after that date.  CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

## V.

## STATEMENT OF FACTS

### Defendants' Industrial Activities at the Industrial Park

85.     Defendant owns and operates the Industrial Park.

86.     The Industrial Park covers more than 250 acres of land located in and just outside Ravena, New York, adjacent to Coeymans Creek.

87.     The Industrial Park contains warehouses, mineral piles, vehicle maintenance areas, various recycling operations, and a number of other industrial activities, in addition to land cleared for construction of industrial facilities.

88.     The street address of the Industrial Park is provided in government records and online resources as 100 Coeymans Industrial Park Lane, Ravena, NY 12143.

89.     The Industrial Park's  location can be uniquely identified as Albany County tax lots 145.-2-41, 156.-2-1.11, 156.-3-1.1, 156.-4-6.1, 156.-4-6.2, 156.-4-6.11, 156.-4-6.12, 156.-4-6.14, 156.-4-6.171, 156.-4-12, 156.-4-6.13, 156.-4-14, 156.-4-6.15, 156.-4-6.16, 156.-4-6.172, 156.-4-8.1, 156.-4-10.1, 168.-2-1, 168.7-1-1.1, 156.-4-5, 168.7-1-1.2, 168.8-1-4, and 156.19-1-1.

90.     Defendants control and operate the Industrial Park.  Defendants manage the industrial park, which includes leasing space to industrial tenants.  Defendants offer services including site-tailored warehouse and office construction and property management to those industrial tenants.

21

91.     Through selection of tenants, establishment of lease terms, and as the owner and manager of the properties, Defendants maintain significant control over the industrial activities occurring at the Industrial Park and the discharges of stormwater from those industrial activities.

92.     Additionally, Defendants themselves engage in industrial activities. At the Industrial Park, Defendants engage in the recycling and processing of construction and demolition debris including topsoil, recycled concrete aggregate (RCA) material, concrete, masonry, gypsum, asphalt, brick, soil, and rock.  Defendants also engage in salt storage, lime storage, gypsum storage, processing and drying of unconditioned fly ash, vehicle and equipment maintenance, and recycling of concrete aggregate.

93.     In addition to warehouses, office buildings, and materials stored outdoors by its industrial tenants, the Industrial Park includes recycled concrete aggregate (RCA) material, a topsoil processing area, space for additional stockpiling and processing of incoming RCA material, a vehicle and equipment maintenance area, and outdoor storage of large salt piles, lime, fly ash, and gypsum.

94.     Defendants constructed, own, and operate the stormwater drainage system that services the entire Industrial Park.  Defendants control the manner in which stormwater runoff is managed throughout the Industrial Park, including both in tenanted areas and on access roads, common spaces, and other untenanted areas.

**Defendants Discharge Polluted Industrial Stormwater through Multiple Unpermitted Outfalls Throughout the Industrial Park**

95.     Defendants sought coverage under the General Permit for a portion of the Industrial Park's discharges of stormwater that Defendants characterized as being associated with mineral and mining activity (SIC code 1499).  The portion of the Industrial Park for which Defendants sought coverage totaled 23.9 acres.  Defendants operate this portion of the Industrial

Park under SPDES identification number NYR00F372.

96.     Defendants' Industrial Park covers approximately 250 acres, and Defendants plan to expand.  Thus, Defendants' permit fails to cover stormwater discharges for the vast majority of the Industrial Park.

97.     Throughout the Industrial Park, stormwater from industrial activities commingles and is discharged from pipes owned and operated by Defendants. The pollution in these stormwater discharges is a product of both Defendants' own industrial activities and those of their industrial tenants.

98.     Several industrial tenants at the Industrial Park engage in industrial activity requiring permit coverage under the General Permit. These activities include, but are not limited to, metal recycling services (SIC code 5093), manufacture of wood pallets and skids (SIC code 2448), fabricating structural metals (SIC code 3441), and recycling of waste materials including transformers and blast furnace slag (SIC code 5093).

99.     These activities all require coverage under the General Permit. While two industrial tenants have obtained permit coverage, many more have not.

100.    Defendants are also responsible for the discharges of stormwater from common areas of the Industrial Park, such as access roads, that are associated with industrial activity but are in Defendants' control, not in the control of tenants.  Defendants do not have permit coverage for these discharges either.

101.    Thus, Defendants are discharging stormwater associated with industrial activity from many parts of the Industrial Park without permit authorization to do so.

**Defendants Fail to Implement the Stormwater Pollution Control Measures and BMPs Required by the General Permit**

102.    Defendants have failed to minimize the discharge of pollution to the extent

achievable by implementing control measures or BMPs that are technologically achievable and economically practicable and achievable in light of best industry practice.

103.    The inadequacy of Defendants' pollution control measures is evidenced by Defendants' repeated benchmark exceedances, even from their permitted outfalls.

104.    For example, Defendants reported exceedances of their TSS benchmark to DEC in samples collected in 2014 at Outfall 001 and in 2018 at Outfall 002.

105.    Riverkeeper has also reviewed data from sampling conducted on October 7, 2019, which is appended to Riverkeeper's notice letter of May 12, 2020 (attached hereto as Exhibit A), showing that Defendants continue to discharge stormwater exceeding benchmarks into Coeymans Creek from multiple outfalls throughout the Industrial Park.

106.    Defendants are not controlling the exposure of pollutant sources to stormwater by using adequate BMPs, and this failure is causing the discharge of pollutants into Coeymans Creek in excess of the benchmarks imposed by the General Permit.

107.    The inadequacy of Defendants' pollution control measures is further evidenced by the deficiencies in Defendants' pollution control measures and practices observed by DEC during multiple inspections of the Industrial Park.

**Defendants Fail to Implement an Adequate SWPPP as Required by the General Permit**

108.    Riverkeeper has not been able to review Defendants' SWPPP because Defendants did not produce a copy of the SWPPP in response to Riverkeeper's request. In the notice letter attached as Exhibit A, sent on May 8, 2020, Riverkeeper requested a copy of Defendants' SWPPP.  Defendants have not provided a copy of the SWPPP.

109.    However, to the extent the Industrial Park is complying with its SWPPP, Defendants' continuing discharges of stormwater that exceeds state benchmarks demonstrates that the SWPPP is clearly inadequate to minimize the discharge of pollutants and to assure

compliance with the General Permit.

110.    On information and belief, Defendants' SWPPP does not include the required

minimum and industry-specific control measures necessary to reduce pollutant levels in

discharges, as evidenced by the fact that Defendants have not sought permit coverage for most of

the Industrial Park's discharges of industrial stormwater, and the fact that those discharges that

are permitted contain pollutants at levels that exceed benchmarks.

111.    On information and belief, Defendants' SWPPP is also inadequate in that it does

not contain an accurate site description and map, including identifying all stormwater flow paths

and discharge locations to surface waters or drains across the entire Industrial Park.

112.    Additionally, the continuing exceedances of benchmark concentrations at the

Industrial Park indicate that Defendants have not amended the SWPPP or taken corrective

correction in order to address deficiencies with their SWPPP.

**Defendants Fail to Conduct Adequate Site Inspections and Take Appropriate Corrective
Actions Required by the General Permit**

113.    Defendants further violate the General Permit by failing to comply with the

inspection requirement of the General Permit.

114.    The General Permit requires deficiencies discovered through routine inspections

to be addressed through corrective action.

115.    Defendants have not complied with this condition of the General Permit, as they

have failed to evaluate the performance of existing stormwater BMPs and to appropriately revise

the SWPPP.

116.    These shortcomings are evidenced by the absence of inspection records observed

by DEC during the agency's previous inspections, by the continuing inadequacy of the Industrial

Park's BMPs and the continued exceedances of benchmarks for the 23.9-acre permitted area

despite years of Defendants having a duty to inspect and evaluate BMPs, and by Defendants'

failure to obtain a permit covering the entire Industrial Park.

**Defendants Fail to Comply with Monitoring, Recordkeeping, and Reporting Requirements of the General Permit**

117.    Defendants have repeatedly failed to comply with the General Permit's

recordkeeping requirements.

118.    Defendants were issued Notices of Violation for failing to submit complete

Discharge Monitoring Reports to DEC in 2014 and 2016, failing to submit Annual Certification

Reports in 2016 and 2018, and failing to report corrective actions to DEC.

119.    Additionally, a 2015 inspection by DEC found that Defendants' SWPPP had not

been kept up to date, that it did not identify which persons were responsible for different

stormwater management responsibilities, that it did not include a maintenance schedule for the

BMPs used to reduce stormwater pollution, that erosion and sedimentation were occurring due to

inadequate BMPs, and that Defendants' monitoring records and sampling results were not kept

with Defendants' SWPPP, meaning it was not possible to determine whether required

inspections had taken place.

120.    Defendants have also failed and continue to fail to adequately monitor and sample

stormwater discharges.

121.    From 2014 to 2018, Defendants' discharge monitoring reports show that

Defendants sampled only the outfall draining the 23.9-acre portion of the Industrial Park

described in Defendants' SWPPP.  But the 2018 SWPPP reports four outfalls draining this area

(including an outfall added to the SWPPP in 2018).

122.    Despite identifying four outfalls in the SWPPP, Defendants only reported on

discharges and sampling from three of the outfalls to DEC in their 2018 NOI seeking renewal

permit coverage and in their annual certification report for 2018 (filed in January 2019).

123.    Thus, Defendants have not monitored and are not monitoring all of the outfalls that Defendants have identified as discharging stormwater from the 23.9-acre portion of the Industrial Park described in Defendants' SWPPP.

124.    Further, in most years Defendants have only sampled their stormwater outfall(s) for total suspended solids.  Because Defendants failed to identify in their Notices of Intent for permit coverage the wide range of Defendants' own industrial activities (including warehousing with vehicle maintenance, and recycling), to say nothing of the wider range of industrial activities taking place at the Industrial Park, Defendants have not analyzed stormwater samples for all required analytes associated with industrial activities.

125.    By failing to identify and monitor outfalls or prepare a SWPPP for most of the Industrial Park, Defendants have not complied with monitoring, recordkeeping, and reporting requirements as they pertain to the bulk of industrial activity occurring at the Industrial Park.

**Defendants Fail to Comply with the Terms of the Construction Permit**

126.    In addition to coverage under the General Permit, Defendants have also obtained coverage under the Construction Permit, under SPDES identification number NYR10W424.

127.    Defendants do not comply with the terms of the Construction Permit, as Defendants have not implemented adequate control measures to reduce pollution from construction activity, failed to properly operate and maintain measures used during construction and post-construction stormwater pollution control measures, and discharged pollutants that cause violations of water quality standards in Coeymans Creek and its tributaries.

128.    In 2013, a DEC inspection found that Defendants' SWPPP for construction activities was out of date, ambiguous, and contained inadequate erosion and sedimentation control measures.

129.     The 2013 inspection also found that the inadequate erosion and sedimentation control measures detailed in the SWPPP had been put in place and had in fact failed, leading to loss of cover material and formation of erosion rills.

130.     Further, the 2013 inspection cautioned that Defendants appeared to be violating the Construction General Permit's effluent limitations by disturbing more than 5 acres of land without a waiver authorizing such extensive disturbance and without a SWPPP detailing adequate measures to avoid pollution.

131.     In 2015, Defendants received a Notice of Violation from DEC for disturbing more than 5 acres without obtaining consent, in violation of the Construction Permit. Additionally, during its inspection, DEC found that Defendants' construction of an infiltration pond did not meet the design standards set out in the New York State Stormwater Management Design Manual.

132.     Under the Construction Permit, a permittee must take corrective action to address erosion or sedimentation problems within a day of receiving a weekly inspection report. The 2015 inspection found that Defendants took months to act on inspection reports identifying the need for CRC to stabilize disturbed areas to avoid erosion and sedimentation.

133.     In 2018, DEC inspected the Industrial Park again and found that, despite the warning in 2013 and the Notice of Violation issued in 2015, Defendants were again disturbing large areas without first obtaining authorization from DEC.

134.     Subsequent to the construction stormwater inspection, DEC requested a SWPPP describing the work and pollution prevention measures that staff had observed.  Based on Defendants' lengthy response time, DEC indicated that it appeared likely that Defendants had not prepared a SWPPP before beginning construction activities or before requesting a waiver to

disturb more than 5 acres of land.

135.    Upon receiving and reviewing the 2018 SWPPP, DEC noted that it was not current: it did not reflect changes to stormwater management measures at the Industrial Park discussed between DEC and Defendants previously.  The SWPPP also did not reflect changes to outfalls and post-construction stormwater management practices at the Industrial Park, and did not cover the entire Industrial Park.  Further, the SWPPP did not identify a trained contractor and DEC observed recordkeeping deficiencies.

136.    The 2018 inspection also documented an improperly constructed outfall, found unpermitted outfalls, found that infiltration swales had been paved over, and found improperly installed and maintain erosion sedimentation controls (silt fencing).

137.    Based on the 2018 inspection, DEC found Defendants' compliance with the Construction Permit unsatisfactory.

138.    Thus, Defendants violate the terms of the Construction Permit because Defendants' SWPPP for compliance with the Construction Permit is inadequate: it does not contain adequate BMPs to meet the Construction Permit's effluent limitations.

139.    In addition, Riverkeeper is informed and believes, and thereupon alleges, that the construction activities taking place at the Industrial Park cause or contribute an increase in total suspended solids in Coeymans Creek.  Defendants therefore violate the terms of the Construction Permit by discharging pollutants that cause violations of water quality standards in Coeymans Creek and its tributaries.

# VI.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Unlawful Discharge of Pollutants
### (Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)

140.    Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

141.    CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

142.    Defendants' SPDES permit covers 23.9 acres of the Industrial Park.  However, the Industrial Park covers more than 250 acres, and Defendants discharge stormwater from multiple outfalls outside of the covered 23.9-acre portion.

143.    Therefore, Defendants have discharged and continue to discharge stormwater associated with industrial activity that contains pollutants from multiple outfalls at the Industrial Park to waters of the United States without a NPDES permit.

144.    Each and every day on which Defendant discharges stormwater associated with industrial activity without authorization under a NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

### SECOND CAUSE OF ACTION

**Failure to Implement the Best Available and Best Conventional
Treatment Technologies Under the General Permit
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

145.    Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

146.    The General Permit, Parts II.D and VII, requires Defendants to implement mandatory general and sector-specific control measures called Best Management Practices ("BMPs") in order to minimize the discharge of pollutants from the Industrial Park.

147.    The selected measures must reduce the discharge of pollution from the Industrial Park through use of the best available technology for the industry in order to comply with both numeric and narrative effluent limits contained in the permit.

148.    For example, the General Permit, Part II.A, requires Defendants to minimize the exposure of pollutants to stormwater at the Industrial Park and – to the extent pollutants are exposed to stormwater despite Defendants' best efforts – to minimize the ultimate discharge of those pollutants in stormwater from the Industrial Park.

149.    Under the General Permit, Part II, the term "minimize" means to "reduce and/or eliminate to the extent achievable using control measures (including Best Management Practices (BMPs) selected and designed in accordance with Part II.D) that are technologically available and economically practicable and achievable in light of best industry practice."

150.    To "minimize" the discharge of pollutants as required by the General Permit, the facility's BMPs must meet the Clean Water Act standards of Best Available Technology Economically Achievable ("BAT" or "BATEA") or Best Conventional Pollutant Control

Technology ("BCT"), depending upon the type of pollutant being discharged.  CWA § 301(b)(2)(A), (E), 33 U.S.C. § 1311(b)(2)(A), (E).

151.    Because the industrial activities carried out at the Facility are not covered by their present permit, Defendant must also implement additional sector-specific control measures specified in Part VII of the General Permit.

152.    Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants have not implemented adequate control measures or BMPs required by the General Permit.

153.    Defendants' ongoing failure to implement adequate control measures and BMPs at the Industrial Park is evidenced by: (a) Defendants' repeated benchmark exceedances; (b) deficiencies in Defendants' pollution control measures and practices observed by DEC during multiple inspections of the Industrial Park; (c) Defendants' pattern of violating the General Permit on the covered 23.9-acre portion of the Industrial Park; and (d) Defendants' discharges of pollutants that cause violations of water quality standards in Coeymans Creek and its tributaries.

154.    Each day that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

155.    Defendants continue to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

## THIRD CAUSE OF ACTION

**Failure to Develop, Implement, and Make Available an Adequate Storm Water Pollution
Prevention Plan in Accordance with the General Permit
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

156.    Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

157.    Part III of the General Permit requires industrial dischargers to develop, implement, and maintain compliance with a Stormwater Pollution Prevention Plan.

158.    As described in Part III.A.3 of the General Permit, the SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with the discharger's industrial activity.

159.    Further, the SWPPP must describe how the discharger has implemented BMPs to minimize the discharge of pollutants in stormwater and to assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.

160.    The SWPPP must address, at a minimum: (1) each of the universally applicable elements set forth in Part III.A of the General Permit; (2) each of the applicable sector-specific plan elements specified in Part VIII of the General Permit, *see* Part III.A.7; and, (3) as applicable, additional special requirements listed in Part III.D of the General Permit for discharges through a municipal separate storm sewer or discharges to impaired waterbodies. Each of these elements also require the discharger to maintain records and documentation of compliance with each of these elements.

161.    The SWPPP must be representative of current site conditions and kept up to date. General Permit, Part III.E.

162.    Defendants must also include the relevant sector-specific SWPPP elements specified in Part VII of the General Permit in addition to the SWPPP elements set forth in Part III of the General Permit.  General Permit, Part III.A.7.

163.    Under Part III.C.2.c. of the General Permit, the owner or operator of a facility "must make a copy of the SWPPP available to the public within fourteen (14) days of receipt of a written request."

164.   Riverkeeper requested a copy of Defendants' SWPPP on May 12, 2020.

165.   Defendants have not provided a copy of a SWPPP to Riverkeeper.

166.   Defendants have failed to develop and implement an adequate SWPPP for the Industrial Park.  Defendants' ongoing failure to develop and implement an adequate SWPPP is evidenced by, *inter alia*: (a) Defendants' failure to seek permit coverage for most of the Industrial Park's discharges of industrial stormwater; and (b) the Industrial Park's discharges of stormwater with pollutant levels exceeding benchmarks.

167.   Defendants have also failed to update the SWPPP for the Industrial Park in response to the analytical results of the Defendants' stormwater monitoring.

168.    Each day that Defendants have failed to develop, implement and update an adequate SWPPP for the Industrial Park is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

169.   Defendants continue to be in violation of the SWPPP requirements each day that they fail to develop and fully implement an adequate SWPPP for the Industrial Park.

## FOURTH CAUSE OF ACTION

**Failure to Conduct Routine Site Inspections and Comply with General Monitoring, Recordkeeping, and Reporting Requirements Under the General Permit (Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

170.   Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

171.   The General Permit requires facility operators to implement monitoring and reporting requirements that will allow facility operators to determine whether they have adequately reduced the level of pollutants in storm water runoff through the development and proper implementation of the facility's SWPPP.

34

172.    Defendants have failed to monitor and report discharges from multiple unpermitted stormwater discharge locations at the Industrial Park.

173.    Defendants have also failed to monitor all of the outfalls that Defendants have identified as discharging stormwater from the 23.9-acre portion of the Industrial Park described in Defendants' SWPPP, in violation of their SPDES Permit.

174.    Defendants have also failed to sample its stormwater discharges for for all required analytes associated with their industrial activities, in violation of their SPDES Permit.

175.    Each and every day on which Defendants fail to comply with any of the General Permit's inspection, monitoring, recordkeeping, and reporting requirements is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These failures are ongoing and continuous violations of the Act.

## FIFTH CAUSE OF ACTION

**Failure to Implement the Best Available and Best Conventional
Treatment Technologies Under the Construction Permit
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

176.    Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

177.    The Construction Permit, Parts I.B. and I.C., requires Defendants to implement mandatory general and sector-specific control measures called Best Management Practices ("BMPs") in order to minimize the discharge of pollutants from the Industrial Park.

178.    The selected measures must reduce the discharge of pollution from construction activities at the Industrial Park through use of the best available technology for the industry in order to comply with the effluent limits contained in the permit.

179.    For example, the Construction Permit, Part I.B, requires Defendants to install, implement, and maintain control measures to "minimize the discharge of pollutants."

35

180.     Under the Construction Permit, Appendix A, the term "minimize" means to "reduce and/or eliminate to the extent achievable using control measures (including best management practices) that are technologically available and economically practicable and achievable in light of best industry practices."

181.     To "minimize" the discharge of pollutants as required by the Construction Permit, the facility's BMPs must meet the Clean Water Act standards of Best Available Technology Economically Achievable ("BAT" or "BATEA") or Best Conventional Pollutant Control Technology ("BCT"), depending upon the type of pollutant being discharged.  CWA § 301(b)(2)(A), (E), 33 U.S.C. § 1311(b)(2)(A), (E).

182.     Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants have not implemented adequate control measures or BMPs required by the Construction Permit.

183.     Defendants' ongoing failure to implement adequate control measures and BMPs at the Industrial Park is evidenced by: (a) Defendants' repeated benchmark exceedances; (b) deficiencies in Defendants' pollution control measures and practices observed by DEC during multiple inspections of the Industrial Park; (c) Defendants' pattern of violating the Construction Permit; and (d) Defendants' discharges of pollutants that cause violations of water quality standards in Coeymans Creek and its tributaries.

184.     Each day that Defendants have failed to develop and implement BAT and BCT in violation of the Construction Permit Permit is a separate and distinct violation of the Construction Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

185.     Defendants continue to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

## SIXTH CAUSE OF ACTION

**Failure to Develop, Implement, and Make Available an Adequate Storm Water Pollution Prevention Plan in Accordance with the Construction Permit**
**(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

186.    Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

187.    Part III of the Construction Permit requires industrial dischargers to develop, implement, and maintain compliance with a Stormwater Pollution Prevention Plan.

188.    As described in Part III.A.1, the SWPPP must document the selection, design, installation, implementation, and maintenance of the control measures and practices used to meet the effluent limitations of Parts I.B and I.C of the Construction Permit.

189.    The SWPPP must also identify potential sources of pollution that may affect the quality of stormwater discharges.  Construction Permit, Part III.A.2.

190.    Further, the SWPPP must describe how the discharger has and will implement BMPs to minimize the discharge of pollutants in stormwater throughout the duration of the construction project, as well as those controls that will be implemented for post-construction stormwater control.  Construction Permit, Part III.A.4.

191.    The SWPPP must include detailed information on stormwater control for the duration of the project as well as permanent stormwater controls installed for post-construction control.  Construction Permit, Part III.B.  At a minimum, this includes: (1) information on the location and size of the project; (2) detailed site maps, showing drainage patterns on- and off-site that could be affected by construction activity, existing and final contours, the location of each stormwater control practice during construction, and the location of each post-construction stormwater control practice; (3) a detailed construction phasing plan, including all post-construction stormwater practices to be constructed as part of the project; (4) a description of

37

soils present at the site and soil testing results; (5) a description of the minimum erosion and sediment control practices to be used for each construction activity; (6) temporary and permanent soil stabilization plans; (7) detailed specifications on operation and maintenance for all control practices, and a schedule for maintenance of all post-construction control practices; (8) an inspection schedule; (9) pollution control measures for construction chemicals and debris; (10) pollution control measures for any other industrial activities occurring on site; (11) the reason for any deviation from the New York State Standards and Specifications for Erosion and Sediment Control or the New York State Stormwater Management Design Manual; and (13) a Stormwater Modeling and Analysis Report.  Construction Permit, Part III.B.1–2.

192.    Under Part VII.E of the Construction Permit, the owner or operator of a facility must make its SWPPP available for any person within five days of receiving a written request.

193.    Riverkeeper requested a copy of Defendants' SWPPP on May 12, 2020.

194.    Defendants have not provided a copy of a SWPPP to Riverkeeper.

195.    Defendants have failed to develop and implement an adequate SWPPP for the construction activities at the Industrial Park.  Defendants' ongoing failure to develop and implement an adequate SWPPP under the Construction Permit is evidenced by, *inter alia*: (a) DEC's 2018 review of the SWPPP, which it found to be unsatisfactory; (b) Defendants' failure to provide Riverkeeper with an adequate SWPPP; and (c) the discharges of stormwater with total suspended solid levels exceeding benchmarks under the General Permit.

196.    Each day that Defendants have failed to develop, implement and update an adequate SWPPP for the construction activities occurring at the Industrial Park is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

197.    Defendants continue to be in violation of the SWPPP requirements each day that they fail to develop and fully implement an adequate SWPPP for the Industrial Park.

### SEVENTH CAUSE OF ACTION

**Violations of Water Quality Standards**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

198.    Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

199.    Coeymans Creek is classified by DEC as a Class C(TS) waterway.  6 N.Y.C.R.R. § 863.6.

200.    New York laws governing Class C waters and trout spawning waters have strict requirements for pollutants including dissolved solids, aluminum, dissolved oxygen content, and others.  6 N.Y.C.R.R. §§ 863.3(h); 703.3, 703.5.

201.    Recent sampling reviewed by Riverkeeper indicates that discharges from the Industrial Park sampled on October 7, 2019 were causing or contributing to violations of numeric water quality criteria in Coeymans Creek and its tributaries, including but not limited to the specific violations occurring at the locations identified below.  The location names and samples referred to below are documented fully in the report titled "Physiochemical Characteristics of Runoff and Surface Waters of Lower Coeymans Creek," which is appended (as Appendix B) to the notice letter that is attached to this Complaint as Exhibit A.  Both the notice letter and its appendices are incorporated by reference in this Complaint.

202.    Samples from the following locations demonstrated that discharges of stormwater from the Industrial Park sampled on October 7, 2019 were causing or contributing to violations of numeric water quality criteria in Coeymans Creek and its tributaries for total dissolved solids: sites 5, 6, 7, and 10.

203.    Samples from the following locations demonstrated that discharges of stormwater from the Industrial Park sampled on October 7, 2019 were causing or contributing to violations of numeric water quality criteria in Coeymans Creek and its tributaries for aluminum: sites 5, 7, 8, 10 and 11.

204.    Samples from the following locations demonstrated that discharges of stormwater from the Industrial Park sampled on October 7, 2019 were causing or contributing to violations of numeric water quality criteria in Coeymans Creek and its tributaries for dissolved oxygen: site 6.

205.    Furthermore, the best available science demonstrates that salmonid fish populations are sensitive to metals, including copper, at levels lower than the numeric criteria in New York's regulations.

206.    Regardless of numeric criteria, however, New York's water quality standards for trout and trout spawning waters demand that waters be kept suitable for egg deposition and fertilization, as well as habitat for trout at all stages of development.  6 N.Y.C.R.R. § 700.1(a)(67), (68).

207.    Defendants' discharges compromise the designated use of Coeymans Creek as a trout spawning waterway and fishery by causing water quality degradation that could impair or disrupt trout behaviors.

208.    Defendants are thus violating Coeymans Creek water quality standards.

209.    Each and every day on which Defendants violate water quality standards is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342. These violations are ongoing and continuous.

## EIGHTH CAUSE OF ACTION

### Violation of Effluent Standard of Limitation
### (Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)

210.     Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

211.     Under Part III.C.2 of the General Permit, the owner or operator of a facility "must make a copy of the SWPPP available to the public within 14 days of receipt of a written request."

212.     Riverkeeper requested that Defendants make a copy of their SWPPP available on May 8, 2020.

213.     Defendant have not responded to this request.

214.     Thus, Defendants are violating Part III.C.2 of the General Permit and the Clean Water Act.

## VII.

## PRAYER FOR RELIEF

215.     Wherefore, Riverkeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a.   Declare Defendants to have violated and to be in violation of the Clean Water Act as alleged herein;

b.   Enjoin Defendants from discharging pollutants from the Industrial Park except as authorized by and in compliance with the General Permit, the Construction Permit, or individual NPDES permits that are at least as strict;

c.   Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

41

d.   Enjoin Defendants from further violating the substantive and procedural requirements of the Construction Permit;

e.   Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT for their industrial activities and their construction activities;

f.   Order Defendants to comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g.   Order Defendants to prepare a SWPPP for the industrial activities at the Industrial Park consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.   Order Defendants to prepare a SWPPP for the construction activities at the Industrial Park consistent with the Construction Permit's requirements and implement procedures to regularly review and update the SWPPP;

i.   Order Defendants to provide Riverkeeper with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Clean Water Act and the Court's orders;

j.   Order Defendants to pay civil penalties of up to $37,500 per day per violation for all violations occurring on or before November 2, 2015, and $55,800 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

k.   Order Defendants to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

42

l.   Order Defendants to pay the costs of litigation, including Riverkeeper's

reasonable investigative costs, attorney fees, expert witness and consultant fees, and

other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

m.  Award any such other and further relief as this Court may deem appropriate.

Dated this 1st day of September, 2020          Respectfully submitted,
New York, New York

By:  /s/ Edan Rotenberg_____

Edan Rotenberg
Julia Muench

SUPER LAW GROUP, LLC
180 Maiden Lane, Suite 603
New York, NY 10038

*Attorneys for Riverkeeper*

# EXHIBIT A

# SUPER LAW GROUP, LLC

May 12, 2020

**<u>Via Certified Mail, Return Receipt Requested</u>**

Coeymans Recycling Center LLC
Attn: Carver Laraway
494 Western Turnpike
Altamont, NY 12009

Coeymans Recycling Center II, LLC
Attn: Carver Laraway
494 Western Turnpike
Altamont, NY 12009

Re:   <u>Notice of Violation and Intent to File Suit under the Clean Water Act</u>

Mr. Laraway,

We are writing on behalf of Riverkeeper, Inc. ("Riverkeeper"),[1] to notify you of Riverkeeper's intent to file suit against Coeymans Recycling Center, LLC; Coeymans Recycling Center II, LLC, and Carver Laraway (collectively "CRC") pursuant to Section 505(a) of the federal Clean Water Act ("CWA")[2] for violations of the CWA.

Riverkeeper intends to file suit, as an organization and on behalf of its adversely affected members, in the United States District Court for the Northern District of New York seeking appropriate equitable relief, civil penalties, and other relief no earlier than 60 days from the postmark date of this letter.[3]

Riverkeeper intends to take legal action because CRC is discharging polluted stormwater from its industrial park located in Ravena, New York ("the Industrial Park")[4] to Coeymans Creek in violation of Sections 301(a) and 402(p)(2)(B) of the Clean Water Act[5] and of the terms of CRC's permit coverage under the General Permit for the Discharge of Stormwater Associated with

---

[1] Riverkeeper, Inc. is a not-for-profit environmental organization existing under the laws of the state of New York, headquartered in Ossining, New York. Riverkeeper's mission includes safeguarding the environmental, recreational and commercial integrity of the Hudson River and its ecosystem, as well as the watersheds that provide New York City with its drinking water. Riverkeeper achieves its mission through public education, advocacy for sound public policies, and participation in legal and administrative forums. Riverkeeper has more than 4,500 members, many of whom reside near to, use, and enjoy the waters and tributaries of the Hudson River and New York Harbor—waters that are polluted by industrial stormwater runoff.

[2] 33 U.S.C. § 1365(a). We provide the parallel citation to the United States Code only on first reference.

[3] *See* 40 C.F.R. § 135.2(a)(3)(c) (notice of intent to file suit is deemed to have been served on the postmark date).

[4] Although some public records refer to the industrial areas owned and operated by CRC as the "Coeymans Industrial Park" and the area owned and operated by CRC II as the "Ravena Industrial Park" Riverkeeper refers to the entire area controlled by CRC and CRC II, including their access roads, as "the Industrial Park" because these are adjacent and contiguous industrial areas operated by two corporations that are 100% owned and controlled by the same individual, Carver Laraway, who exerts significant control over all industrial activities occurring in the Industrial Park.

[5] 33 U.S.C. §§ 1311(a), 1342(p)(2)(B).

Industrial Activity ("General Permit")[6] issued by the New York State Department of Environmental Conservation ("DEC").

# I.

# BACKGROUND

## A.  The Clean Water Act in New York State

To protect the waters of the United States, the Clean Water Act prohibits the discharge of pollutants from a "point source" into the waters of the United States without a National Pollutant Discharge Elimination System ("NPDES") permit.[7]  NPDES permits are issued by the United States Environmental Protection Agency ("EPA) or by states that have been authorized by EPA to act as NPDES permitting authorities, provided the state permitting program ensures compliance with the procedural and substantive requirements of the Clean Water Act.[8]  In New York, DEC has been delegated the authority to issue NPDES permits.  As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  The current version of the General Permit came into effect on March 1, 2018.  DEC also has the authority to issue SPDES permits (i.e., "State" NPDES permits) for individual applicants.

DEC has designated more than 7,000 river miles, 319,000 acres of larger waterbodies, 940 square miles of bays and estuaries, and 592 miles of Great Lakes shoreline in the State as "impaired," or not meeting water quality standards, and unable to support beneficial uses such as fish habitat and water contact recreation.[9]  For the overwhelming majority of water bodies listed as impaired, stormwater[10] is cited as a primary source of the pollutants causing the impairment.[11] Contaminated stormwater discharges can and must be controlled in order to improve the quality and health of these waterbodies.

---

[6] *SPDES Multi-Sector General Permit For Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-17-004, N.Y. DEP'T ENVITL. CONSERVATION (Mar. 1, 2018), https://www.dec.ny.gov/docs/water_pdf/msgp017004.pdf [hereinafter *General Permit*]. This General Permit replaces earlier general permits for the discharge of stormwater associated with industrial activity and will expire on February 28, 2023.

[7] CWA §§ 301(a), 402(a), 33 U.S.C. §§ 1311(a), 1342(a).

[8] CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

[9] *New York Assessment Data*, U.S. ENVT'L PROTECTION AGENCY (2012), http://ofmpub.epa.gov/waters10/attains_state.report_control?p_state=NY&p_cycle=2012&p_report_type=A; *see also NYS Section 305(b) Water Quality Report*, N.Y. DEP'T ENV'TL CONSERVATION (2016), http://www.dec.ny.gov/chemical/66532.html.

[10] "Stormwater" is water from precipitation events that flows across the ground and pavement after it rains or after snow and ice melt.  40 C.F.R. § 122.26(b)(13).

[11] *See generally New York Assessment Data*, *supra* note 9, *Executive Summary* at 4, http://www.dec.ny.gov/docs/water_pdf/305bexecsumm10.pdf (identifying urban stormwater runoff as a top ten source of water quality impairment); *id.*, *Top Ten Water Quality Issues in New York State* at 1, http://www.dec.ny.gov/docs/water_pdf/305btopten10.pdf (identifying urban stormwater runoff as the top source of pollution for impaired waterways in New York State).

### B.  Coeymans Creek

Stormwater discharges flow from the Industrial Park into Coeymans Creek, its tributaries, and their adjacent wetlands, all of which are waters of the United States protected by the Clean Water Act.  Coeymans Creek flows into the Hudson River.

DEC has classified Coeymans Creek, at the points where the Industrial Park  discharges, as a Class C(TS) water.[12]   Under New York's Water Quality Standards, a waterbody that is designated Class C is meant to be suitable for fishing and for fish, shellfish, and wildlife survival, as well as for potential use for primary and secondary contact recreation.[13]  The New York Water Quality Standards also set numeric and narrative criteria for different water pollution parameters including dissolved oxygen, oil and grease, suspended and settleable solids, bacteria (pathogens), pH, temperature, nutrients, and others.[14]   A waterbody must meet these numeric and narrative criteria in order to support its designated uses.[15]

In addition to those general Class C requirements, DEC has specific requirements for (TS) waters.  Under New York's Water Quality Standards, a waterbody that is designated as (TS) must be kept suitable for trout habitat and trout spawning.[16]  In fact, DEC stocks Onesquethaw Creek—an upstream tributary to Coeymans Creek—with brown trout (*Salmo trutta*).[17]  Under New York regulations for the Hudson River and its tributaries in Albany County, the term "trout" includes the genera *Coregonus*, *Oncorhynchus*, *Prosopium*, *Salmo*, *Salvelinus*, and *Thymallus*.[18]  Trout and trout spawning waters require a higher dissolved oxygen content[19] and a lower nitrite content.[20]  In addition, New York's regulations require that trout spawning waters provide both "habitat in which trout can survive and grow within a normal range on a year-round basis,"[21] and:

> [W]aters in which trout eggs can be deposited and be fertilized by
> trout inhabiting such waters (or connecting waters) and in which
> those eggs can develop and hatch, and the trout hatched therefrom

---

[12] 6 N.Y.C.C.R. § 863.6; *see also Lower Hudson River WI/PWL – Hudson-Hannacrois Creek Watershed*, N.Y. DEP'T ENVTL. CONSERVATION, 9–10 (2007), https://www.dec.ny.gov/docs/water_pdf/wilhudshannacroiscr.pdf [hereinafter *Hudson-Hannacrois WI/PWL*].

[13] 6 N.Y.C.R.R. § 701.8.

[14] *See generally* 6 N.Y.C.R.R. §§ 702, 703 (outlining quantitative and qualitative standards, respectively).

[15] *See* Division of Water Technical and Operational Guidance Series, *Ambient Water Quality Standards and Guidance Values and Groundwater Effluent Limitations*, N.Y. DEP'T ENVTL. CONSERVATION, (June 1998), http://www.dec.ny.gov/docs/water_pdf/togs1112.pdf [hereinafter *TOGS*].

[16] 6 N.Y.C.R.R. § 701.25(b); *see also Environmental Resource Mapper*, N.Y. DEP'T ENVT'L CONSERVATION, Lat. 42.481891099706075, Long. -73.79676584073098 (last visited Apr. 5, 2020), *available via* https://www.dec.ny.gov/animals/38801.html (showing Coeymans Creek, where the Industrial Park discharges, is a "significant anadromous fish concentration area," as well as habitat for "rare dragonflies and damsel flies," shortnose sturgeon (listed as endangered), and "other animals and rare plants listed as endangered, threatened, or rare by New York State.").

[17] *Current Season Spring Trout Stocking*, N.Y. OFF. INFO. TECH. SERVICES (last updated June 10, 2019), https://data.ny.gov/Recreation/Current-Season-Spring-Trout-Stocking/d9y2-n436.

[18] 6 N.Y.C.R.R. § 863.3(i).

[19] § 863.3(h); § 703.3 ("For trout spawning waters (TS), the DO concentration shall be not less than 7.0 mg/L from other than natural conditions.  For trout waters (T), the minimum daily average shall be not less than 6.0 mg/L, and at no time shall the concentration be less than 5.0 mg/L.  For nontrout waters, the minimum daily average shall not be less than 5.0 mg/L, and at no time shall the DO concentration be less than 4.0 mg/L.").

[20] § 703.5 ("Standard is 100 µg/L [micrograms per liter] except 20 µg/L for trout waters (T or TS).").

[21] § 700.1(a)(67).

could survive and grow to a sufficient size and stage of development
to enable them to either remain and grow to adult trout therein, or
migrate into and survive in other trout waters.[22]

Trout are extremely sensitive to some metals, particularly copper, even at extremely low levels.
Discharges of metals at concentrations that interfere with any trout life functions impair these
waters. Additionally, there is a dissolved solids standard that applies to all class C waters, including
C(TS) waters: "as low as practicable to maintain the best usage of waters but in no case shall it
exceed 500 mg/L."[23] The best usage of a C(TS) water is trout spawning. Thus, dissolved solids in
Coeymans Creek and its tributaries must be kept as low as practicable to maintain trout spawning
and in no case can dissolved solids exceed 500 mg/L in these waters. Chloride and sodium are
major contributors to dissolved solids. Therefore, if a water sample from Coeymans Creek or its
tributaries contains chloride or sodium at levels that harm trout spawning, or if it exceeds 500mg/L
of chloride or sodium, it also violates the dissolved solids standard.

The trout spawning habitat in Coeymans Creek depends on both general and trout-specific
water quality requirements being met.

### C.  **The Industrial Park**

The Industrial Park covers more than 250 acres of land located in and just outside
Ravena, New York, adjacent to Coeymans Creek. The Industrial Park contains warehouses,
mineral piles, vehicle maintenance areas, various recycling operations, and a number of other
industrial activities, in addition to land cleared for construction of industrial facilities. The street
address of the Industrial Park is provided in government records and online resources as 100
Coeymans Industrial Park Lane, Ravena, NY 12143. For clarity, the Industrial Park location can
be uniquely identified as Albany County tax lots 145.-2-41, 156.-2-1.11, 156.-3-1.1, 156.-4-6.1,
156.-4-6.2, 156.-4-6.11, 156.-4-6.12, 156.-4-6.14, 156.-4-6.171, 156.-4-12, 156.-4-6.13, 156.-4-
14, 156.-4-6.15, 156.-4-6.16, 156.-4-6.172, 156.-4-8.1, 156.-4-10.1, 168.-2-1, 168.7-1-1.1, 156.-
4-5, 168.7-1-1.2, 168.8-1-4, and 156.19-1-1.

As the Industrial Park has grown, local citizens have become increasingly concerned
about the impact of the Park on Coeymans Creek.  Riverkeeper has reviewed a report
investigating water quality and stormwater inflows to Coeymans Creek produced for Hudson
River Sloop Clearwater, Inc, attached here at Appendix B.[24]  As part of the analysis, surface
water grab samples were taken on October 7, 2019.[25]  These samples revealed that outfalls from
the Park are contributing to the degradation of Coeymans Creek.[26]

CRC controls and operates the industrial park. CRC manages the park, which includes
leasing space to industrial tenants. It offers services including site-tailored warehouse and office
construction and property management to those industrial tenants.

---

[22] § 700.1(a)(68).

[23] § 703.3.

[24] Jeremy Dietrich, *Physiochemical Characteristics of Runoff and Surface Waters of Lower Coeymans Creek*, IA
Envtl. (Jan. 28, 2020) [hereinafter Appendix B].

[25] Appendix B, at 2.

[26] Appendix B, at 4.

### D.  CRC's Control of Industrial Activities at the Industrial Park

Through selection of tenants, establishment of lease terms, and as the owner and manager of the properties, CRC maintains significant control over the industrial activities occurring at the Industrial Park and the discharges of stormwater from those industrial activities.

Additionally, CRC itself engages in industrial activities. At the Industrial Park, CRC engages in recycling and processing of construction and demolition debris including topsoil, recycled concrete aggregate (RCA) material, concrete, masonry, gypsum, asphalt, brick, soil and rock.  CRC also engages in salt storage, lime storage, gypsum storage, processing and drying of unconditioned fly ash, vehicle and equipment maintenance, and recycling of concrete aggregate. In addition to warehouses, office buildings, and materials stored outdoors by its industrial tenants, the Industrial Park  includes recycled concrete aggregate (RCA) material, a topsoil processing area, space for additional stockpiling and processing of incoming RCA material, a vehicle and equipment maintenance area, and outdoor storage of large salt piles, lime, fly ash, and gypsum.

CRC constructed, owns, and operates the stormwater drainage system that services the entire Industrial Park. It controls the manner in which stormwater runoff is managed throughout the Industrial Park, including both in tenanted areas and on access roads, common spaces, and other untenanted areas.

### E.  CRC's Stormwater Permits

CRC sought coverage under the General Permit for a portion of the Industrial Park's discharges of stormwater associated that CRC characterized as being associated with mineral and mining activity (SIC code 1499).  The portion of the Industrial Park for which CRC sought coverage totaled 23.9 acres.  CRC was issued the SPDES identification number NYR00F372.

CRC also obtained coverage under the SPDES General Permit for Stormwater Discharges from Construction Activity ("Construction General Permit") and was issued the SPDES identification number NYR10W424.

CRC has repeatedly violated its stormwater permits. Between 2014 and 2018, CRC received at least six Notices of Violation from DEC for failure to submit required paperwork, including Discharge Monitoring Reports, Annual Certification Reports, and Corrective Action Forms.  Additionally, CRC's stormwater samples exceeded benchmarks for Total Suspended Solids ("TSS") for monitoring periods 2014 and 2018.  DEC also found CRC to be acting in violation of the Construction General Permit for disturbing more than 5 acres of soil without prior written approval.

## II.

## STANDARDS AND LIMITATIONS ALLEGED TO HAVE BEEN VIOLATED AND ACTIVITIES ALLEGED TO BE VIOLATIONS

The CWA prohibits the discharge of pollutants to the waters of the United States except in accordance with a valid NPDES permit.[27] Coeymans Creek, its tributaries, adjacent wetlands, and the Hudson River are "water[s] of the United States," as defined in 40 C.F.R. § 122.2.

 CRC's industrial activity at the Industrial Park has caused and continues to cause a "discharge of pollutants" within the meaning of CWA Section 502(12)[28] and a "stormwater discharge associated with industrial activity" within the meaning of 40 C.F.R. § 122.26(b)(14) from the Industrial Park on at least each and every day that there has been a rain event of more than 0.1 inches.[29]

Additionally, as owners and operators who maintain significant control over the Industrial Park, including the point sources discharging pollutants from the Industrial Park, CRC is liable for discharges from CRC's point sources at CRC's Industrial Park that convey pollutants added by CRC's industrial tenants.  As the developer, owner and operator of Coeymans Industrial Park, CRC has knowingly allowed and promoted industrial activities in outdoor areas throughout the Industrial Park.  In addition to its control over tenants and their operations, CRC also maintains and controls the Industrial Park's common infrastructure including its swales, ditches, pipes, and other measures used to collect and convey stormwater.  CRC thereby controls the discharges of storm water associated with industrial activities that flow from the Industrial Park into Coeymans Creek. Owners or operators of an industrial park who have sufficient control over the park's discharges of industrial stormwater can be held liable under the CWA even if they do not themselves perform the industrial activities.

The CRC Industrial Park is only authorized to discharge stormwater from most industrial activities pursuant to the General Permit, which conditions stormwater discharges on compliance with all of the General Permit's terms.  Similarly, CRC is only authorized to discharge stormwater associated with its construction activities in compliance with the conditions of the Construction General Permit.  Each permit term of each of those permits constitutes an "effluent limitation" within the meaning of CWA Section 505(f).[30]

Riverkeeper's concerns regarding ongoing violations at CRC's Industrial Park are centered around three core issues.

---

[27] CWA §§ 301(a), 402.
[28] 33 U.S.C. § 1362(12).
[29] EPA has determined that precipitation greater than 0.1 inches in a 24-hour period constitutes a measurable precipitation event for the purposes of evaluating stormwater runoff associated with industrial activity.  *See, e.g.*, 40 C.F.R. § 122.26(c)(i)(E)(6) (using 0.1 inches as the distinguishing threshold of a storm event).
[30] 33 U.S.C. 1365(f).

First, Riverkeeper believes that not all of the industrial stormwater from the CRC's Industrial Park is covered by its existing permits.  There are multiple unpermitted discharges (outfalls) at the Industrial Park.

Second, CRC is violating the terms of its coverage under the General Permit and Construction General Permit because the Industrial Park's stormwater pollution prevention and management practices are inadequate.  As a result of inadequate pollution control measures, CRC has self-reported repeated benchmark exceedances for TSS. CRC has also shown a pattern of noncompliance with the permit's other conditions, including improper and inadequate reporting, and failing to keep and maintain all necessary documentation at the Industrial Park as required by the General Permit.  Further, Riverkeeper has reviewed data from recent sampling of outfalls surrounding the Industrial Park and verified that stormwater exceeding benchmarks continues to flow into Coeymans Creek from the Industrial Park's outfalls.[31]  Stormwater associated with CRC's industrial activities is flowing through those outfalls and CRC is responsible for all discharges of industrial stormwater from the Industrial Park. CRC's pattern of benchmark exceedances and other permit violations indicate it is violating multiple provisions of its permit including, most centrally, failing to use and implement the required level of stormwater pollution controls – controls meeting the Clean Water Act's "Best Available Technology" standard – in violation of the General Permit and the Construction General Permit.

Third, CRC is violating the terms of its coverage under the General Permit and the Construction General Permit because CRC's discharges of stormwater cause or contribute to violations of water quality standards in Coeymans Creek and its tributaries.  Recent sampling of outfalls surrounding the Industrial Park indicates that CRC's discharges have caused exceedances of water quality criteria for dissolved oxygen, total dissolved solids, aluminum, and protection of trout spawning waters.

### A. CRC is violating the CWA and the General Permit by discharging stormwater associated with industrial activity from unpermitted outfalls.

CRC owns and operates an industrial park covering approximately 250 acres, with plans to expand.  CRC has sought permit coverage for discharges from outfalls draining just 23.9 acres of the Industrial Park.  Thus, CRC's permit fails to cover stormwater discharges for the vast majority of the Industrial Park. Throughout the Industrial Park, stormwater from industrial activities commingles and is discharged from pipes owned and operated by CRC. The pollution in these stormwater discharges is a product of both CRC's own industrial activities and those of its industrial tenants.

Several industrial tenants at the Industrial Park engage in industrial activity requiring permit coverage under the MSGP. These activities include, but are not limited to, metal recycling services (SIC code 5093), manufacture of wood pallets and skids (SIC code 2448), fabricating structural metals (SIC code 3441), and recycling of waste materials including transformers and blast furnace slag (SIC code 5093). These activates all require coverage under the General Permit. While two industrial tenants have obtained permit coverage, many more have not.

---

[31] Appendix B, at 4.

CRC cannot rely on permit coverage obtained by a tenant as the terms of that coverage do not extend to CRC.  Further, CRC cannot rely on its tenants with permit coverage to avoid discharges of stormwater from CRC's conveyances that violate the Clean Water Act; CRC's tenants are not complying with the Clean Water Act either. For example, TCI of NY, LLC, one of CRC's industrial tenants, filed a "certificate of no exposure" with the DEC despite exposing industrial pollutants to stormwater discharged into Coeymans Creek without a permit. Another industrial tenant, Baroni Recycling, Inc., has obtained coverage under the General Permit but is violating the effluent limitations in the permit.

Further, CRC is responsible for the discharges of stormwater from common areas of the Industrial Park, such as access roads, that are associated with industrial activity but are in CRC's control, not in the control of tenants. CRC does not have Permit coverage for these discharges either.

Thus, CRC is discharging stormwater associated with industrial activity from many parts of the Industrial Park without permit authorization to do so, in violation of the CWA.[32]

### B.  CRC is not complying with the terms of its General Permit coverage.

As a discharger of stormwater associated with industrial activity, CRC must comply at all times with the requirements of a NPDES permit. By discharging stormwater associated with industrial activity in violation of the General Permit, CRC is violating CWA Sections 301(a) and 402(a) and (p).  The following summarizes the main General Permit requirements that CRC has failed and continues to fail to meet.

#### 1.  CRC has not implemented adequate control measures and Best Management Practices that meet the best available technology standards.

The Clean Water Act requires CRC to use stormwater pollution control measures that reflect, and prohibits the discharge of pollutants above, the level that is commensurate with application of the best available technology economically achievable ("BAT"), which applies to toxic and non-conventional pollutants, and best conventional pollutant control technology ("BCT") for conventional pollutants.[33]  With respect to those portions of the Industrial Park for which CRC sought permit coverage, CRC has established a pattern of noncompliance in failing to meet benchmark, monitoring, and reporting requirements – indicating that it has failed to implement BAT.

---

[32] CWA §§ 301(a), 402; *General Permit*, *supra* note 4, Part I.D.

[33] CWA § 304(b)(2), (b)(4), 33 U.S.C. § 1314.  Conventional pollutants include total suspended solids ("TSS"), oil & grease, pH, biochemical oxygen demand ("BOD"), and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.15.

> **a.  CRC has not implemented adequate control measures and Best Management Practices that meet the best available technology standard to control discharges of stormwater associated with industrial activity.**

The General Permit requires CRC to adopt both general and sector-specific control measures,  including controls measures referred to as Best Management Practices ("BMPs"), in order to minimize the discharge of pollutants from the Industrial Park.[34]  The General Permit requires that the owner or operator select, design, install, and implement control measures (including BMPs) in accordance with good engineering practices, to meet the effluent limits contained in the permit.[35]  The General Permit's effluent limits include both limits specific to certain sectors[36] and limits that apply to all facilities.[37]  These technology-based restrictions include minimizing the exposure of pollutants to stormwater and minimizing the discharge of pollutants in stormwater to the extent achievable using control measures (including BMPs) that are technologically available, economically practicable, and achievable in light of best industry practice.[38]

CRC has not minimized the discharge of pollution to the extent achievable by implementing control measures or BMPs that are technologically achievable and economically practicable and achievable in light of best industry practice, as required by Parts II and VII of the General Permit.[39] Riverkeeper's allegation is based on the following points, among other things.

First, CRC reported exceedances of its TSS benchmark to DEC in samples collected in 2014 at Outfall 001 and in 2018 at Outfall 002. Self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), *vacated on other grounds*, 485 U.S. 931 (1988).

Second, in addition to CRC's own monitoring Riverkeeper has reviewed data from sampling conducted on October 7, 2019, showing that CRC continues to discharge stormwater exceeding benchmarks into Coeymans Creek from multiple outfalls throughout the Industrial Park.[40] Based on CRC's self-reporting and recent observations of benchmark exceedances in CRC's discharges, Riverkeeper believes and therefore alleges that CRC is violating the General Permit by failing to implement stormwater pollution control measures that meet the BAT standard.

---

[34] *General Permit*, *supra* note 4, Part II.D; *see also id.*, Parts VII.M. (control measures for automobile salvage), VII.N. (control measures for scrap recycling), VII.P. (control measures for land transportation).

[35] *Id.*, Part II; *see also id.*, Part III.A.7 ("The SWPPP must document in writing the location and type of BMPs installed and implemented at the facility to achieve the non-numeric effluent limits in Part II.A. and where applicable in Part VII, and the sector specific numeric effluent limitations in Part VII.").

[36] *See generally id.*, Part VII (laying out sector-specific requirements).

[37] *General Permit*, *supra* note 4, Part II.

[38] *Id.* ("Effluent limits are required to minimize the discharge of pollutants.  The term 'minimize' means reduce and/or eliminate to the extent achievable using control measures (including Best Management Practices . . .) that are technologically available and economically practicable and achievable in light of best industry practice.").

[39] *Id.*, Parts I.B.1, VII.

[40] Appendix B, at 4, 7–9.

Finally, Riverkeeper's belief that CRC's pollution control measures are inadequate is further strengthened by the deficiencies in CRC's pollution control measures and practices observed by DEC during multiple inspections of the Industrial Park, as discussed further below.

In light of CRC's failures to use adequate measures in areas of the Industrial Park for which it has sought permit coverage and CRC's failure to obtain permit coverage for the rest of the Industrial Park, Riverkeeper believes and alleges that CRC's failure to implement stormwater control measures as necessary to comply with the Clean Water Act and the General Permit's effluent limitations is a violation of the Clean Water Act that extends throughout the Industrial Park. In sum, CRC has not developed and/or implemented adequate pollution controls to meet the federal BAT/BCT standard or comply with the General Permit at the Industrial Park. CRC has violated and will continue to violate the General Permit and the CWA on each and every day that it fails to develop and/or implement adequate pollution controls.

> **b. CRC has not implemented adequate control measures has not implemented adequate control measures and Best Management Practices that meet the best available technology standards while carrying out construction activities.**

CRC has recently expanded the Industrial Park and, on information and belief, plans to carry out various construction activities at the Industrial Park.  Riverkeeper alleges that CRC has a continuing pattern of discharging industrial stormwater from its construction activities in violation of the terms of its coverage under the Construction General Permit and that these ongoing and intermittent violations will recur as CRC continues to engage in construction activities. Riverkeeper alleges that CRC violates the Construction General Permit by not implementing adequate control measures to reduce pollution from construction activity, by failing to properly operate and maintain measures used during construction and post construction stormwater pollution control measures, and by discharging pollutants that cause violations of water quality standards in Coeyman's Creek and its tributaries.

Riverkeeper's belief that CRC has a continuing pattern of violating the Clean Water Act during construction activities is based on, among other things:

- In 2013, a DEC inspection found that CRC's SWPPP for construction activities was out of date, ambiguous, and contained inadequate erosion and sedimentation control measures.

- The 2013 inspection also found that the inadequate erosion and sedimentation control measures detailed in the SWPPP had been put in place and had in fact failed, leading to loss of cover material and formation of erosion rills.

- Further, the 2013 inspection cautioned that CRC appeared to be violating the Construction General Permit's effluent limitations by disturbing more than 5 acres of land without a waiver authorizing such extensive disturbance and without a SWPPP detailing adequate measures to avoid pollution.

- In 2015, CRC received a Notice of Violation from DEC for disturbing more than 5 acres without obtaining consent, in violation of the Construction General Permit. Additionally, during its inspection, DEC found that CRC's construction of an infiltration pond did not meet the design standards set out in the New York Stated Stormwater Design Manual.

- Under the Construction General Permit, a permittee must take corrective action to address erosion or sedimentation problems within a day of receiving a weekly inspection report. The 2015 inspection found that CRC took months to act on inspection reports identifying the need for CRC to stabilize disturbed areas to avoid erosion and sedimentation.

- In 2018, DEC inspected the Industrial Park again and found that, despite the warning in 2013 and the Notice of Violation issued in 2015, CRC was again disturbing large areas without first obtaining authorization from DEC.  Subsequent to the construction stormwater inspection, DEC requested a SWPPP describing the work and pollution prevention measures that staff had observed.  Based on CRC's lengthy response time, DEC indicated that it appeared likely that CRC had not prepared a SWPPP before beginning construction activities or before requesting a waiver to disturb more than 5 acres of land.

- Upon receiving and reviewing the 2018 SWPPP, DEC noted that it was not current: it did not reflect changes to stormwater management measures at the Industrial Park discussed between DEC and CRC previously.  The SWPPP also did not reflect changes to outfalls and post-construction stormwater management practices at the Industrial Park, and did not cover the entire Industrial Park.  Further, the SWPPP did not identify a trained contractor and DEC observed recordkeeping deficiencies.

- The 2018 inspection also documented an improperly constructed outfall, found unpermitted outfalls, found that infiltration swales had been paved over, and found improperly installed and maintain erosion sedimentation controls (silt fencing).

- Based on the 2018 inspection, DEC found CRC's compliance with the Construction General Permit unsatisfactory.

Finally, Riverkeeper's allegation that CRC is violating the terms of its coverage under the Construction General Permit is supported by Riverkeeper's review of recent stormwater sampling at the Facility, which shows that CRC is discharging pollutants that cause violations of water quality standards, as discussed further below.

**2.  CRC has not developed and implemented adequate Stormwater Pollution Prevention Plans to comply with the General Permit or the Construction General Permit.**

The General Permit requires all industrial dischargers to prepare, make available, and implement a Stormwater Pollution Prevention Plan ("SWPPP") in accordance with schedules established in the General Permit.[41] The SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with industrial activity. Further, the SWPPP must describe and ensure the implementation of practices that minimize the discharge of pollutants in these discharges and that assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.[42]

Among other things, the SWPPP must include: a general site description; a general location map identifying the location of the Industrial Park and all receiving waters to which stormwater discharges; information related to a company stormwater pollution prevention team; a summary of potential pollutant sources; a description of control measures and BMPs; schedules and procedures for implementation of control measures, monitoring, and inspections; and documentation of inspections, samples, and corrective actions taken at the Industrial Park.[43] Part VII of the General Permit also imposes sector-specific requirements related to the SWPPP.

As discussed above, the Industrial Park is not controlling the exposure of pollutant sources to stormwater by using adequate BMPs, and this failure is causing the discharge of pollutants into Coeymans Creek in excess of the benchmarks imposed by the General Permit.  To the extent the Industrial Park is complying with its industrial SWPPP, the SWPPP is clearly inadequate to minimize the discharge of pollutants and to assure compliance with the General Permit.

Riverkeeper further alleges that the Industrial Park's SWPPP for compliance with the General Permit does not include, and that CRC has not implemented, the required minimum and industry specific control measures necessary to reduce pollutant levels in discharges to BAT and BCT levels across the entire Industrial Park.  This is evidenced by the fact that CRC has not sought permit coverage for most of the Industrial Park's discharges of industrial stormwater, and the fact that those discharges that are permitted contain pollutants at levels that exceed benchmarks.

Riverkeeper also alleges that CRC's SWPPP for the Industrial Park is inadequate in at least the following respect: it does not contain an accurate site description and map, including identifying all stormwater flow paths and discharge locations to surface waters or drains across the entire Industrial Park.

Further, the General Permit requires CRC to keep the SWPPP current by amending it whenever there are changes in design, construction, operation, or maintenance at the Industrial Park that affect the potential to discharge pollutants, or whenever the SWPPP is found to be ineffective in eliminating or significantly minimizing pollutants.[44]   Wherever a SWPPP is

---

[41] *General Permit*, *supra* note 4, Part III.C.
[42] *Id.*, Part III.A.
[43] *Id.*
[44] *Id.*, Part III.E.

inadequate in managing stormwater discharges, a permittee must address such deficiencies through corrective actions.[45]   The continuing exceedances of benchmark concentrations indicate that such amendments have not been made or have been inadequate.

CRC's failures to prepare and/or implement an adequate SWPPP in all the above respects constitute violations of the General Permit.  CRC has been conducting and continues to conduct industrial operations at the Facilities with an inadequately developed, implemented, and/or amended SWPPP.  By failing to take corrective actions to modify its SWPPP in order to minimize pollutant discharge, CRC has violated the General Permit and the Clean Water Act.[46]

Like the General Permit (i.e. the permit for discharges of stormwater from most industrial activity), the Construction General Permit (the permit for discharges from construction activities) also requires CRC to develop, implement, and continually update a SWPPP. As discussed above, DEC has reviewed CRC's Construction General Permit SWPPP and found deficiencies in the past. Riverkeeper alleges that CRC is violating the Clean Water Act and the Construction General Permit because CRC's SWPPP for compliance with the Construction General Permit is inadequate: it does not contain adequate BMPs to met the Construction General Permit's effluent limitations.

### 3.  CRC is not conducting adequate site inspections nor taking appropriate corrective actions.

Part IV of the General Permit obliges CRC to conduct an annual comprehensive site inspection of the Industrial Park that includes evaluation of areas where industrial materials or activities are exposed to precipitation, or where spills and leaks have occurred within the past three years.[47]  The inspection must ensure that all stormwater discharges are adequately controlled and that all BMPs are functioning as expected.[48]   Records of this inspection must be kept for five years.[49]

In addition, qualified facility personnel must carry out routine inspections at least quarterly.[50]   During these inspections, personnel must evaluate conditions and maintenance needs of stormwater management devices, detect leaks and ensure the good condition of containers, evaluate the performance of the existing stormwater BMPs described in the SWPPP, and document any deficiencies in the implementation and/or adequacy of the SWPPP.[51]  Part V of the General Permit requires such deficiencies to be addressed through corrective actions.[52]

---

[45] *General Permit*, *supra* note 4, Part V.
[46] To the extent that CRC did develop an adequate SWPPP, Riverkeeper alleges that CRC is failing to comply with it.  This is also a violation of the General Permit and the Clean Water Act.
[47] *General Permit*, *supra* note 4, Part IV.A.1.
[48] *Id.*
[49] *Id.*, Part IV.A.2.
[50] *Id.*, Part IV.B.
[51] *Id.*
[52] *Id.*, Part V.

Riverkeeper alleges that CRC has failed to conduct such evaluations and to then appropriately revise its SWPPP. These shortcomings are evidenced by the absence of inspection records observed by DEC in previous inspections, by the continuing inadequacy of the Industrial Park's BMPs and the continued exceedances of benchmarks for the 23.9 acre permitted area despite years of CRC having a duty to inspect and evaluate BMPs, and by CRC's failure to obtain a permit covering the entire Industrial Park. CRC violates the General Permit and the Clean Water Act on each and every day that it operates with an inadequate inspection regime and an inadequately developed, implemented, and/or revised SWPPP and stormwater pollution control measures.

### 4. CRC is not complying with monitoring, recordkeeping, and reporting requirements.

The General Permit requires all covered facilities to conduct multiple types of analytical monitoring, and DEC may require additional individualized monitoring as well.[53] In particular, all facilities authorized under the General Permit must, at minimum:

- conduct visual monitoring of stormwater discharges at least quarterly;[54]
- collect and analyze stormwater samples for each outfall at least annually;[55]
- perform an annual dry weather inspection to detect non-stormwater discharges;[56]
- inspect and sample discharges from secondary containment and transfer areas;[57]
- document storm events during which any samples are taken;[58]
- document all of these monitoring activities;[59]
- keep records of the monitoring with the Industrial Park's SWPPP;[60] and
- submit an annual report to DEC accompanied by a Discharge Monitoring Report detailing the results of all required stormwater samples, as well as reports that document any instance of non-compliance with benchmarks or numeric effluent limitations.[61]

CRC has a pattern of not complying with recordkeeping requirements. CRC was issued Notices of Violation for failing to submit complete Discharge Monitoring Reports to DEC in 2014 and 2016, failing to submit Annual Certification Reports in 2016 and 2018, and failing to report corrective actions to DEC. Additionally, a 2015 inspection by DEC found that CRC's SWPPP had not been kept up to date, that it did not identify which persons were responsible for different stormwater management responsibilities, it did not include a maintenance schedule for the BMPs used to reduce stormwater pollution, that erosion and sedimentation were occurring due to inadequate BMPs, and that CRC's monitoring records and sampling results were not kept with

---

[53] *General Permit*, *supra* note 4, Part IV.F.1, 2.
[54] *Id.*, Part IV.E.
[55] *Id.*, Part IV.F.2.
[56] *Id.*, Part IV.C.
[57] *Id.*, Part IV.F.1.e.
[58] *Id.*, Part IV.D.3.
[59] *Id.*, Parts IV, VI.
[60] *Id.*, Part IV.A.2.
[61] *Id.*, Part VI.A.

CRC's SWPPP, meaning it was not possible to determine whether required inspections had taken place.

Riverkeeper alleges that CRC has failed and continues to fail to adequately monitor and sample stormwater discharges. From 2014 to 2018, CRC's discharge monitoring reports show that it sampled only outfall draining the 23.9 acre portion of the Facility described in CRC's SWPPP.[62] But the 2018 SWPPP reports four outfalls draining this area (including an outfall added to the SWPPP in 2018). Despite identifying four outfalls in the SWPPP, however, CRC only reported on discharges and sampling from three of the outfalls to DEC in its 2018 NOI seeking renewal permit coverage and in its annual certification report for 2018 (filed in January 2019). Thus, CRC has not monitored and is not monitoring all of the outfalls that CRC has identified as discharging stormwater from the 23.9 acre portion of the Industrial Park described in CRC's SWPPP, in violation of Part IV.F.2 of the General Permit.

Further, in most years CRC has only sampled its stormwater outfall(s) for total suspended solids. Because CRC failed to identify in its Notices of Intent for permit coverage the wide range of CRC's own industrial activities (including warehousing with vehicle maintenance, and recycling), to say nothing of the wider range of industrial activities taking place at the Industrial Park, CRC has not analyzed stormwater samples for all required analytes associated with its industrial activities. Thus, CRC is violating the benchmark monitoring provisions of Parts IV and VII of the General Permit.

Finally, by failing to identify and monitor outfalls or prepare a SWPPP for most of the Industrial Park, CRC has not complied with monitoring, recordkeeping, and reporting requirements as they pertain to the bulk of industrial activity occurring at the Industrial Park.

Riverkeeper is also not necessarily aware of all industrial activities taking place at the Industrial Park. To the extent that industrial activities other than the above are carried out at the Industrial Park, other sampling may be required as well.[63] This notice provides CRC with sufficient information to identify the standards and limitations – including sampling requirements – that apply to all categories of its industrial activities.

Based on observations of Coeymans Creek's water quality, the Industrial Park's discharges, and publicly available documents, Riverkeeper alleges that CRC is failing to monitor and accurately report the results of such monitoring to DEC, and to keep adequate records, as required by Parts IV and VII of the General Permit. CRC is therefore in violation of the General Permit and the Clean Water Act.

---

[62] In its Notice of Intent of August 8, 2013 ("NOI"), CRC reported two outfalls through which it discharged stormwater associated with industrial activity from the Industrial Park to Coeymans Creek. On June 29, 2015, CRC submitted a Notice of Modification ("NOM") indicating that the Facility only required permit coverage for one.
[63] *See generally id.*, Part VII (outlining sector-specific requirements).

**C. CRC is violating water quality standards by polluting Coeymans Creek with substances that interfere with its designated uses as a fishing, wildlife, and trout spawning waterway.**

As discussed above, Coeymans Creek is classified by DEC as a Class C(TS) waterway.[64] New York laws governing Class C waters and trout spawning waters have strict requirements for pollutants including dissolved solids, aluminum, dissolved oxygen content, and others.[65] Recent sampling reviewed by Riverkeeper indicates that discharges from the Industrial Park sampled on October 7, 2019 were causing or contributing to violations of numeric water quality criteria in Coeymans Creek and its tributaries for total dissolved solids, aluminum, TDS, and dissolved oxygen.

Furthermore, the best available science demonstrates that salmonid fish populations are sensitive to metals, including copper, at levels lower than the numeric criteria in New York's regulations. Regardless of numeric criteria, however, New York's water quality standards for trout and trout spawning waters demand that waters be kept suitable for egg deposition and fertilization, as well as habitat for trout at all stages of development.[66] Riverkeeper believes, and therefore alleges, that discharges from CRC compromise the designated use of Coeymans Creek as a trout spawning waterway and fishery by causing water quality degradation that could impair or disrupt trout behaviors.  CRC is therefore violating the Clean Water Act.

∗          ∗          ∗          ∗          ∗

In sum, CRC's discharge of stormwater associated with industrial activities without coverage under a NPDES permit; CRC's discharge of stormwater associated with industrial activities in violation of the General Permit and Construction General Permit; and CRC's failure to adequately protect the designated uses of Coeymans Creek all constitute violations of the General Permit and Construction General Permit and of Sections 301(a) and 402(p) of the Clean Water Act.

**III.**

**PERSONS RESPONSIBLE FOR ALLEGED VIOLATIONS**

Coeymans Recycling Center, LLC, Coeymans Recycling Center II, LLC and Carver Laraway, the managing member of the two LLCs, (collectively "CRC") are the persons responsible for the violations alleged in this Notice.  CRC has control over the day-to-day industrial activities at this Industrial Park.  Therefore, CRC is responsible for managing stormwater at the Industrial Park in compliance with the CWA.  Riverkeeper hereby puts CRC on notice that if Riverkeeper subsequently identifies additional persons as also being responsible for the violations set forth above, Riverkeeper intends to include those persons in this action.

---

[64] 6 N.Y.C.R.R. § 863.6; *see also Hudson-Hannacrois WI/PWL*, *supra* note 13, at 9–10.
[65] 6 N.Y.C.R.R. §§ 863.3(h); 703.3, 703.5.
[66] § 700.1(a)(67), (68)

## IV.

## **LOCATION OF THE ALLEGED VIOLATION**

The violations alleged in this Notice have occurred and continue to occur at the Industrial Park. The street address of the Industrial Park is provided in government records and online resources as 100 Coeymans Industrial Park Lane, Ravena, NY 12143. For clarity, the Industrial Park occupies the following Albany County tax lots: 145.-2-41, 156.-2-1.11, 156.-3-1.1, 156.-4-6.1, 156.-4-6.2, 156.-4-6.11, 156.-4-6.12, 156.-4-6.14, 156.-4-6.171, 156.-4-12, 156.-4-6.13, 156.-4-14, 156.-4-6.15, 156.-4-6.16, 156.-4-6.172, 156.-4-8.1, 156.-4-10.1, 168.-2-1, 168.7-1-1.1, 156.-4-5, 168.7-1-1.2, 168.8-1-4, and 156.19-1-1.  Stormwater associated with industrial activity discharges from CRC's outfalls into storm sewer drains that connect to Coeymans Creek and into natural tributaries of Coeymans Creek.  The failure to develop and implement pollution prevention plans and take the other required measures are violations occurring at the Industrial Park in general and in the inadequate documents themselves.[67]

## V.

## **DATES OF VIOLATION**

CRC violates the Clean Water Act on each and every day that it operates with an inadequate inspection regime and an inadequately developed, implemented, and/or revised SWPPP and stormwater pollution control measures, pursuant to General Permit Parts II–V.

Additionally, every day upon which CRC has failed to apply for permit coverage since CRC's industrial tenants first commenced operations at the Industrial Park and discharged polluted stormwater is a separate violation of Section 301(a) of the CWA and EPA's regulations implementing the CWA.[68]

As owners of the Industrial Park, CRC has discharged pollution from the Industrial Park without a permit or in violation of the permit's terms – and thus in violation of CWA Section 301(a) – on every day on which there has been a measurable precipitation event or discharge of previously accumulated precipitation (i.e., snowmelt) over 0.1 inches.  Each discharge of stormwater from an outfall at the CRC Industrial Park that is not permitted, or that is discharged in violation of the permit's terms, constitutes a separate violation of the General Permit and the CWA. Riverkeeper believes and alleges that CRC has violated the CWA on each and every day there has been a measurable precipitation event or discharge of previously accumulated

---

[67] The federal courts have held that a reasonably specific indication of the area where violations occurred, such as the name of the facility, is sufficient and that more precise locations need not be included in the notice.  *See, e.g.*, *Natural Resources Defense Council v. Southwest Marine, Inc.*, 945 F. Supp. 1330, 1333 (S.D. Cal. 1996), aff'd 236 F.3d 985, 996 (9th Cir. 2000); *City of New York v. Anglebrook Ltd. Partnership*, 891 F. Supp. 900, 908 (S.D.N.Y. 1995); *United Anglers v. Kaiser Sand & Gravel Co.*, No. C 95-2066 CW, 1995 U.S. Dist. LEXIS 22449 at *4 (N.D. Cal. Sept. 27, 1995)

[68] *See also* 33 U.S.C. §§ 402(p)(3)(A) and (p)(4)(A) (requiring the establishment of industrial stormwater NPDES permits and of a permit application process).

precipitation (i.e., snowmelt) over 0.1 inches—at least 378 individual events from March 2015 through April 2020,[69] including 60 precipitation events of 1 inch or more.

If CRC seeks permit coverage after receiving this letter but fails to fully comply with the requirements of the General Permit (or an individual permit), each day upon which CRC claims coverage under a NPDES permit but fails to comply with that permit will constitute a separate day of violation with respect to each unmet condition of that permit.

CRC is liable for the above-described violations occurring prior to the date of this letter, and for every day after the date of this letter that these violations continue.  In addition to the violations set forth above, this Notice covers all violations of the CWA evidenced by information that becomes available to Riverkeeper after the date of this Notice of Intent to File Suit.[70]  These violations are ongoing and, barring full compliance with the permitting requirements of the Clean Water Act, these violations will continue.

## VI.

## RELIEF REQUESTED

Riverkeeper will ask the court to order CRC to comply with the Clean Water Act, to pay penalties, and to pay Riverkeeper's costs and legal fees.

First, Riverkeeper will seek declaratory relief and injunctive relief to prevent further violations of the Clean Water Act pursuant to Sections 505(a) and (d) and such other relief as permitted by law.  Riverkeeper will seek an order from the Court requiring CRC to comply with the General Permit throughout the Industrial Park, or to obtain individual NPDES permit coverage for the Industrial Park, and to correct all other identified violations through direct implementation of control measures and demonstration of full regulatory compliance.

Second, pursuant to CWA Section 309(d),[71] each separate violation of the CWA subjects CRC to a penalty not to exceed $37,500 per day for each violation that occurred prior to November 2, 2015, and up to $55,800 per day for each violation that occurred after November 2, 2015.[72] Riverkeeper will seek the full penalties allowed by law.

---

[69] Appendix A (summarizing NOAA data for local events exceeding 0.1 inch); *Climate Data Online Search*, NAT'L OCEANIC & ATMOSPHERIC ADMIN., https://www.ncdc.noaa.gov/cdo-web/search (last visited Apr. 17, 2020). Riverkeeper's allegations include, but are not limited to, these events, as they do not include snowmelt events.  The Appendices to this letter include data on the water-equivalent amount of snowfall during this period, so that CRC can determine for itself the number and dates of significant snowmelt events.

[70] *See, e.g. Pub. Interest Research Grp. v. Hercules, Inc.*, 50 F.3d 1239, 1248-49 (3d Cir. 1995) (holding a notice that adequately identifies specific violations to a potential defendant also covers repeated and related violations that the plaintiff learns of later. "For example, if a permit holder has discharged pollutant 'x' in excess of the permitted effluent limit five times in a month but the citizen has learned only of four violations, the citizen will give notice of the four violations of which the citizen then has knowledge but should be able to include the fifth violation in the suit when it is discovered.")

[71] 33 U.S.C. § 1319(d); *see also* 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

[72] 40 C.F.R. §§ 19.2, 19.4.

Third, pursuant to CWA Section 505(d), Riverkeeper will seek recovery of its litigation fees and costs (including reasonable attorney and expert witness fees) associated with this matter.[73]

## VII.

## PERSONS GIVING NOTICE

The full name, address, and telephone number of the persons giving notice are as follows:

Riverkeeper, Inc.
20 Secor Road
Ossining, NY 10562
(914) 478-4501
Attn: Victoria Leung

## VIII.

## IDENTIFICATION OF COUNSEL

Riverkeeper is represented by legal counsel in this matter.  The name, address, and telephone number of Riverkeeper's attorneys are:

Edan Rotenberg, Esq.
Julia Muench, Esq.
Super Law Group, LLC
180 Maiden Lane, Suite 603
New York, New York 10013
(212) 242-2355

## IX.

## CONCLUSION

The foregoing provides more than sufficient information to permit CRC to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.[74]

Riverkeeper requests CRC to send a copy of its SWPPP to the undersigned attorney.[75] Riverkeeper nonetheless encourages CRC to begin examining ways it can improve its SWPPP in order to comply with the General Permit.  However, Riverkeeper asks that CRC please inform

---

[73] 33 U.S.C. § 1365(d).
[74] 40 C.F.R. § 135.3(a).
[75] Note that under Part III.C.2 of the General Permit, the owner or operator of a facility "must make a copy of the SWPPP available to the public within 14 days of receipt of a written request."

the undersigned attorney of any such efforts, so that Riverkeeper can work with CRC to avoid disputes over the contents of the SWPPP.[76]  Likewise, if CRC does not have a SWPPP for the Industrial Park, Riverkeeper encourages CRC to begin development of a SWPPP and to keep the undersigned attorney informed of such efforts.

During the sixty-day notice period, Riverkeeper is willing to discuss effective remedies for the violations noted in this letter that may avoid the necessity of protracted litigation.  If CRC wishes to pursue such discussions, please contact the undersigned attorney immediately so that negotiations may be completed before the end of the sixty-day notice period.  We do not intend to delay the filing of a complaint in federal court, regardless of whether discussions are continuing at the conclusion of the sixty days.

Very truly yours,

Edan Rotenberg
Super Law Group, LLC
180 Maiden Lane, Suite 603
New York, New York 10038
(212) 242-2355

cc:

Andrew Wheeler, Administrator
Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Basil Seggos, Commissioner
New York State Department of
   Environmental Conservation
625 Broadway
Albany, NY 12233-1011

Peter D. Lopez, EPA Region 2
   Administrator
Environmental Protection Agency
290 Broadway
New York, NY 10007-1866

---

[76] Riverkeeper will not send a new notice letter in response to any effort CRC makes to come into compliance with the Clean Water Act after receiving this letter, for example, by re-developing a SWPPP.  The federal courts have held that citizens sending a notice letter are not required to identify inadequacies in compliance documents that do not yet exist and are "not required to send a second notice letter in order to pursue specific claims regarding the inadequacies of [a defendant's] post-notice compliance efforts." *WaterKeepers N. Cal. v. AG Indus. Mfg.*, 375 F.3d 913, 920 (9th Cir. 2004). *See also Sw. Marine, Inc.*, 236 F.3d at 997 (9th Cir. 2000) ("subject matter jurisdiction is established by providing a notice that is adequate on the date it is given to the defendant.  The defendant's later changes . . . do not retroactively divest a district court of jurisdiction under 33 U.S.C. § 1365(b)."); *Anglebrook Ltd. P'ship*, 891 F. Supp. at 908 (S.D.N.Y. 1995) (plaintiff's notice letter based on inadequacies of defendant's original SWPPP held sufficient to establish court's jurisdiction, even though defendant later prepared a revised SWPPP).

# <u>Appendix A</u>:
## NOAA Precipitation Data
### *Events Exceeding 0.1 inch*

**Station Information**

| Name | Station # | Latitude | Longitude | Elevation |
|---|---|---|---|---|
| **Coeymans Hollow** | US1NYAB0042 | 42.504078 | -73.898102 | 219.8 |
| **New Baltimore** | US1NYGR0005 | 42.4429425 | -73.7866275 | 12.2 |
| **Ravena** | US1NYAB0046 | 42.495718 | -73.821758 | 50.6 |

**Measurement Key**

| Name | Description |
|---|---|
| **DAPR** | Number of days in the MDPR |
| **MDPR** | Multiday precipitation total |
| **PRCP** | Precipitation |
| **WESF** | Water equivalent of snowfall |

## Appendix A:  NOAA Precipitation Data Since 2015
### Events Exceeding 0.1 Inch

| NAME | DATE | DAPR | MDPR | PRCP | WESF |
|------|------|------|------|------|------|
| RAVENA 1.4 NNW, NY US | 43935 | | | 1.5 | |
| RAVENA 1.4 NNW, NY US | 43932 | | | 0.5 | |
| RAVENA 1.4 NNW, NY US | 43925 | | | 0.92 | |
| RAVENA 1.4 NNW, NY US | 43918 | | | 0.62 | |
| RAVENA 1.4 NNW, NY US | 43909 | | | 0.54 | |
| RAVENA 1.4 NNW, NY US | 43903 | | | 0.1 | |
| RAVENA 1.4 NNW, NY US | 43888 | | | 0.58 | |
| RAVENA 1.4 NNW, NY US | 43874 | | | 0.36 | 0.4 |
| RAVENA 1.4 NNW, NY US | 43871 | 3 | 0.25 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43869 | | | 0.5 | |
| NEW BALTIMORE 0.2 SE, NY US | 43868 | | | 0.27 | |
| RAVENA 1.4 NNW, NY US | 43867 | | | 0.51 | 0.4 |
| RAVENA 1.4 NNW, NY US | 43857 | 2 | 0.9 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43856 | | | 0.87 | |
| NEW BALTIMORE 0.2 SE, NY US | 43849 | | | 0.22 | |
| RAVENA 1.4 NNW, NY US | 43846 | | | 0.11 | 0.1 |
| RAVENA 1.4 NNW, NY US | 43843 | 3 | 0.13 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43842 | | | 0.27 | |
| RAVENA 1.4 NNW, NY US | 43835 | 5 | 0.2 | | |
| RAVENA 1.4 NNW, NY US | 43830 | 7 | 1.17 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43829 | 7 | 0.76 | | |
| RAVENA 1.4 NNW, NY US | 43817 | 2 | 0.53 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43816 | | | 0.23 | |
| RAVENA 1.4 NNW, NY US | 43815 | 3 | 0.7 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43814 | | | 0.12 | |
| NEW BALTIMORE 0.2 SE, NY US | 43813 | | | 0.61 | |
| NEW BALTIMORE 0.2 SE, NY US | 43809 | | | 0.11 | |
| NEW BALTIMORE 0.2 SE, NY US | 43803 | 7 | 1.25 | | |
| RAVENA 1.4 NNW, NY US | 43802 | 2 | 1.45 | | |
| RAVENA 1.4 NNW, NY US | 43794 | 3 | 1.16 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43793 | | | 0.65 | |
| NEW BALTIMORE 0.2 SE, NY US | 43792 | | | 0.12 | |
| NEW BALTIMORE 0.2 SE, NY US | 43789 | 5 | 1.15 | | |
| RAVENA 1.4 NNW, NY US | 43788 | | | 1.11 | |
| RAVENA 1.4 NNW, NY US | 43777 | | | 0.12 | |
| RAVENA 1.4 NNW, NY US | 43770 | | | 0.93 | |
| RAVENA 1.4 NNW, NY US | 43766 | 2 | 0.92 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43765 | | | 0.13 | |
| RAVENA 1.4 NNW, NY US | 43761 | | | 0.56 | |
| RAVENA 1.4 NNW, NY US | 43756 | | | 0.12 | |
| RAVENA 1.4 NNW, NY US | 43755 | | | 2.65 | |
| RAVENA 1.4 NNW, NY US | 43746 | | | 1 | |
| RAVENA 1.4 NNW, NY US | 43742 | | | 0.52 | |
| NEW BALTIMORE 0.2 SE, NY US | 43741 | | | 0.21 | |
| RAVENA 1.4 NNW, NY US | 43740 | | | 0.24 | |
| RAVENA 1.4 NNW, NY US | 43739 | | | 0.8 | |

## Appendix A:  NOAA Precipitation Data Since 2015
### Events Exceeding 0.1 Inch

| NAME | DATE | DAPR | MDPR | PRCP | WESF |
|------|------|------|------|------|------|
| RAVENA 1.4 NNW, NY US | 43735 | | | 0.28 | |
| RAVENA 1.4 NNW, NY US | 43713 | | | 0.14 | |
| RAVENA 1.4 NNW, NY US | 43711 | 4 | 0.99 | | |
| RAVENA 1.4 NNW, NY US | 43699 | 3 | 1.26 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43698 | | | 0.22 | |
| RAVENA 1.4 NNW, NY US | 43696 | 7 | 1.14 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43695 | | | 0.44 | |
| NEW BALTIMORE 0.2 SE, NY US | 43693 | | | 0.17 | |
| NEW BALTIMORE 0.2 SE, NY US | 43691 | | | 0.14 | |
| RAVENA 1.4 NNW, NY US | 43689 | 5 | 0.12 | | |
| RAVENA 1.4 NNW, NY US | 43684 | 2 | 0.11 | | |
| RAVENA 1.4 NNW, NY US | 43682 | 3 | 1.64 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43681 | | | 0.67 | |
| RAVENA 1.4 NNW, NY US | 43679 | 10 | 0.39 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43678 | | | 0.23 | |
| NEW BALTIMORE 0.2 SE, NY US | 43676 | | | 0.15 | |
| RAVENA 1.4 NNW, NY US | 43669 | 4 | 2.25 | | |
| RAVENA 1.4 NNW, NY US | 43664 | 2 | 0.55 | | |
| RAVENA 1.4 NNW, NY US | 43654 | 3 | 0.9 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43653 | | | 1.17 | |
| RAVENA 1.4 NNW, NY US | 43647 | 4 | 0.19 | | |
| RAVENA 1.4 NNW, NY US | 43642 | 2 | 0.72 | | |
| RAVENA 1.4 NNW, NY US | 43637 | | | 0.28 | |
| NEW BALTIMORE 0.2 SE, NY US | 43636 | 6 | 0.89 | | |
| RAVENA 1.4 NNW, NY US | 43635 | | | 0.13 | |
| RAVENA 1.4 NNW, NY US | 43633 | 2 | 0.74 | | |
| RAVENA 1.4 NNW, NY US | 43630 | | | 0.21 | |
| RAVENA 1.4 NNW, NY US | 43627 | | | 1.34 | |
| RAVENA 1.4 NNW, NY US | 43622 | | | 0.62 | |
| NEW BALTIMORE 0.2 SE, NY US | 43619 | | | 0.17 | |
| RAVENA 1.4 NNW, NY US | 43618 | 2 | 0.75 | | |
| RAVENA 1.4 NNW, NY US | 43614 | | | 0.41 | |
| RAVENA 1.4 NNW, NY US | 43609 | | | 0.3 | |
| NEW BALTIMORE 0.2 SE, NY US | 43608 | 6 | 0.23 | | |
| RAVENA 1.4 NNW, NY US | 43605 | 3 | 0.21 | | |
| RAVENA 1.4 NNW, NY US | 43600 | | | 0.11 | |
| RAVENA 1.4 NNW, NY US | 43599 | | | 0.6 | |
| RAVENA 1.4 NNW, NY US | 43598 | 2 | 0.74 | | |
| RAVENA 1.4 NNW, NY US | 43596 | 2 | 0.32 | | |
| RAVENA 1.4 NNW, NY US | 43591 | 2 | 0.15 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43590 | | | 0.11 | |
| RAVENA 1.4 NNW, NY US | 43589 | | | 0.38 | |
| RAVENA 1.4 NNW, NY US | 43585 | | | 0.12 | |
| RAVENA 1.4 NNW, NY US | 43584 | 2 | 0.71 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43582 | | | 0.83 | |
| RAVENA 1.4 NNW, NY US | 43581 | 6 | 0.33 | | |

## Appendix A:  NOAA Precipitation Data Since 2015
### Events Exceeding 0.1 Inch

| NAME | DATE | DAPR | MDPR | PRCP | WESF |
|------|------|------|------|------|------|
| NEW BALTIMORE 0.2 SE, NY US | 43580 | 7 | 0.91 | | |
| RAVENA 1.4 NNW, NY US | 43575 | | | 0.58 | |
| RAVENA 1.4 NNW, NY US | 43571 | | | 0.11 | |
| RAVENA 1.4 NNW, NY US | 43570 | | | 1.04 | 0 |
| RAVENA 1.4 NNW, NY US | 43569 | 2 | 0.11 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43568 | | | 0.21 | |
| RAVENA 1.4 NNW, NY US | 43565 | | | 0.2 | |
| RAVENA 1.4 NNW, NY US | 43562 | 2 | 0.16 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43561 | | | 0.22 | 0.2 |
| RAVENA 1.4 NNW, NY US | 43556 | | | 0.15 | |
| NEW BALTIMORE 0.2 SE, NY US | 43554 | | | 0.11 | |
| RAVENA 1.4 NNW, NY US | 43547 | | | 0.18 | |
| RAVENA 1.4 NNW, NY US | 43546 | | | 0.41 | 0 |
| RAVENA 1.4 NNW, NY US | 43535 | 2 | 2.7 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43534 | | | 0.24 | |
| RAVENA 1.4 NNW, NY US | 43528 | | | 0.24 | 0.2 |
| RAVENA 1.4 NNW, NY US | 43524 | | | 0.2 | 0.3 |
| NEW BALTIMORE 0.2 SE, NY US | 43521 | | | 0.12 | |
| RAVENA 1.4 NNW, NY US | 43520 | 2 | 0.17 | | |
| RAVENA 1.4 NNW, NY US | 43517 | 3 | 0.18 | | |
| RAVENA 1.4 NNW, NY US | 43514 | | | 0.19 | 0.2 |
| RAVENA 1.4 NNW, NY US | 43509 | | | 0.86 | 0.7 |
| RAVENA 1.4 NNW, NY US | 43504 | | | 0.2 | |
| RAVENA 1.4 NNW, NY US | 43503 | | | 0.47 | |
| RAVENA 1.4 NNW, NY US | 43495 | | | 0.55 | 0.6 |
| RAVENA 1.4 NNW, NY US | 43490 | | | 0.96 | |
| RAVENA 1.4 NNW, NY US | 43489 | | | 0.14 | |
| RAVENA 1.4 NNW, NY US | 43487 | 3 | 1.49 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43486 | | | 0.41 | |
| NEW BALTIMORE 0.2 SE, NY US | 43485 | | | 0.74 | |
| RAVENA 1.4 NNW, NY US | 43474 | | | 0.32 | |
| RAVENA 1.4 NNW, NY US | 43472 | 2 | 0.13 | | |
| RAVENA 1.4 NNW, NY US | 43470 | | | 0.36 | |
| RAVENA 1.4 NNW, NY US | 43466 | 3 | 0.49 | | |
| RAVENA 1.4 NNW, NY US | 43456 | | | 0.87 | |
| RAVENA 1.4 NNW, NY US | 43455 | | | 0.75 | |
| RAVENA 1.4 NNW, NY US | 43451 | | | 0.59 | 0.1 |
| RAVENA 1.4 NNW, NY US | 43437 | 3 | 0.51 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43436 | | | 0.4 | |
| RAVENA 1.4 NNW, NY US | 43431 | | | 0.81 | 0.1 |
| RAVENA 1.4 NNW, NY US | 43429 | | | 0.44 | |
| RAVENA 1.4 NNW, NY US | 43424 | | | 0.21 | 0.2 |
| RAVENA 1.4 NNW, NY US | 43420 | | | 0.84 | |
| RAVENA 1.4 NNW, NY US | 43418 | | | 0.26 | |
| RAVENA 1.4 NNW, NY US | 43417 | 2 | 0.45 | | |
| RAVENA 1.4 NNW, NY US | 43414 | | | 0.48 | |

## Appendix A:  NOAA Precipitation Data Since 2015
### Events Exceeding 0.1 Inch

| NAME | DATE | DAPR | MDPR | PRCP | WESF |
|------|------|------|------|------|------|
| RAVENA 1.4 NNW, NY US | 43411 | | | 0.3 | |
| RAVENA 1.4 NNW, NY US | 43410 | | | 0.3 | |
| RAVENA 1.4 NNW, NY US | 43408 | 2 | 1.6 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43407 | | | 1.39 | |
| RAVENA 1.4 NNW, NY US | 43406 | | | 0.16 | |
| RAVENA 1.4 NNW, NY US | 43402 | 2 | 0.69 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43401 | | | 1.05 | |
| RAVENA 1.4 NNW, NY US | 43400 | | | 0.37 | |
| RAVENA 1.4 NNW, NY US | 43389 | | | 0.16 | |
| RAVENA 1.4 NNW, NY US | 43386 | | | 0.11 | |
| NEW BALTIMORE 0.2 SE, NY US | 43385 | | | 0.8 | |
| NEW BALTIMORE 0.2 SE, NY US | 43376 | | | 1.49 | |
| NEW BALTIMORE 0.2 SE, NY US | 43371 | | | 0.35 | |
| NEW BALTIMORE 0.2 SE, NY US | 43370 | 4 | 1.25 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43365 | | | 0.11 | |
| NEW BALTIMORE 0.2 SE, NY US | 43362 | | | 0.18 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43361 | | | 2.14 | |
| NEW BALTIMORE 0.2 SE, NY US | 43356 | | | 0.21 | |
| NEW BALTIMORE 0.2 SE, NY US | 43354 | | | 1.28 | |
| NEW BALTIMORE 0.2 SE, NY US | 43350 | | | 0.45 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43339 | | | 0.22 | |
| NEW BALTIMORE 0.2 SE, NY US | 43335 | 4 | 0.42 | | |
| COEYMANS HOLLOW 2.1 N, NY US | 43334 | | | 0.23 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43331 | | | 0.55 | |
| NEW BALTIMORE 0.2 SE, NY US | 43330 | | | 1.47 | |
| NEW BALTIMORE 0.2 SE, NY US | 43328 | 6 | 1.62 | | |
| COEYMANS HOLLOW 2.1 N, NY US | 43326 | | | 0.53 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43324 | | | 1.19 | |
| NEW BALTIMORE 0.2 SE, NY US | 43321 | | | 0.21 | |
| NEW BALTIMORE 0.2 SE, NY US | 43320 | | | 0.11 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43316 | | | 2.09 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43315 | | | 0.35 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43314 | | | 1.83 | |
| NEW BALTIMORE 0.2 SE, NY US | 43310 | | | 0.22 | |
| NEW BALTIMORE 0.2 SE, NY US | 43309 | | | 0.81 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43307 | | | 0.86 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43305 | | | 0.96 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43304 | | | 1.18 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43303 | | | 0.27 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43299 | | | 0.94 | |
| NEW BALTIMORE 0.2 SE, NY US | 43296 | | | 1.1 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43288 | | | 0.12 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43287 | | | 0.19 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43280 | | | 0.86 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43279 | | | 0.29 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43276 | | | 0.29 | |

**Appendix A:  NOAA Precipitation Data Since 2015**

**Events Exceeding 0.1 Inch**

| NAME | DATE | DAPR | MDPR | PRCP | WESF |
|------|------|------|------|------|------|
| NEW BALTIMORE 0.2 SE, NY US | 43275 | | | 0.12 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43256 | | | 0.3 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43255 | | | 0.21 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43252 | | | 0.13 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43249 | 7 | 0.33 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43248 | | | 0.14 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43240 | | | 0.64 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43236 | | | 0.13 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43233 | | | 0.23 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43231 | | | 0.19 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43227 | | | 0.39 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43225 | | | 0.14 | |
| NEW BALTIMORE 0.2 SE, NY US | 43224 | 7 | 1.17 | | |
| COEYMANS HOLLOW 2.1 N, NY US | 43221 | | | 0.16 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43220 | 5 | 1.43 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43216 | | | 0.37 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43215 | | | 0.34 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43207 | | | 1.55 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43206 | 3 | 0.26 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43197 | | | 0.2 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43194 | | | 0.25 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43193 | | | 0.15 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43187 | | | 0.14 | |
| NEW BALTIMORE 0.2 SE, NY US | 43172 | | | 0.14 | 0.1 |
| COEYMANS HOLLOW 2.1 N, NY US | 43167 | | | | 1 |
| COEYMANS HOLLOW 2.1 N, NY US | 43162 | | | | 2.1 |
| NEW BALTIMORE 0.2 SE, NY US | 43161 | | | 0.75 | 0.8 |
| COEYMANS HOLLOW 2.1 N, NY US | 43157 | | | 0.38 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43156 | | | 0.29 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43155 | | | 0.19 | |
| COEYMANS HOLLOW 2.1 N, NY US | 43151 | | | 0.13 | |
| NEW BALTIMORE 0.2 SE, NY US | 43139 | | | 0.64 | |
| NEW BALTIMORE 0.2 SE, NY US | 43136 | | | 0.43 | |
| NEW BALTIMORE 0.2 SE, NY US | 43124 | | | 0.6 | |
| NEW BALTIMORE 0.2 SE, NY US | 43123 | | | 0.21 | |
| NEW BALTIMORE 0.2 SE, NY US | 43117 | | | 0.32 | |
| NEW BALTIMORE 0.2 SE, NY US | 43113 | | | 1.22 | |
| NEW BALTIMORE 0.2 SE, NY US | 43105 | | | 0.18 | 0.2 |
| NEW BALTIMORE 0.2 SE, NY US | 43103 | 5 | 0.93 | | |
| NEW BALTIMORE 0.2 SE, NY US | 43082 | | | 0.18 | |
| NEW BALTIMORE 0.2 SE, NY US | 43081 | | | 0.21 | 0.2 |
| NEW BALTIMORE 0.2 SE, NY US | 43079 | | | 0.28 | 0.3 |
| NEW BALTIMORE 0.2 SE, NY US | 43075 | | | 0.2 | |
| NEW BALTIMORE 0.2 SE, NY US | 43038 | | | 1.5 | |
| NEW BALTIMORE 0.2 SE, NY US | 43033 | | | 0.15 | |
| NEW BALTIMORE 0.2 SE, NY US | 43024 | | | 0.13 | |

## Appendix A:  NOAA Precipitation Data Since 2015
### Events Exceeding 0.1 Inch

| NAME | DATE | DAPR | MDPR | PRCP | WESF |
|------|------|------|------|------|------|
| NEW BALTIMORE 0.2 SE, NY US | 43020 | | | 0.13 | |
| NEW BALTIMORE 0.2 SE, NY US | 43018 | | | 0.11 | |
| NEW BALTIMORE 0.2 SE, NY US | 43017 | | | 0.36 | |
| NEW BALTIMORE 0.2 SE, NY US | 43008 | | | 0.15 | |
| NEW BALTIMORE 0.2 SE, NY US | 42985 | | | 0.44 | |
| NEW BALTIMORE 0.2 SE, NY US | 42984 | | | 0.33 | |
| NEW BALTIMORE 0.2 SE, NY US | 42982 | | | 0.34 | |
| NEW BALTIMORE 0.2 SE, NY US | 42981 | | | 0.17 | |
| NEW BALTIMORE 0.2 SE, NY US | 42972 | 7 | 0.92 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42962 | | | 0.42 | |
| NEW BALTIMORE 0.2 SE, NY US | 42960 | | | 0.29 | |
| NEW BALTIMORE 0.2 SE, NY US | 42959 | | | 0.29 | |
| NEW BALTIMORE 0.2 SE, NY US | 42955 | | | 0.65 | |
| NEW BALTIMORE 0.2 SE, NY US | 42941 | | | 0.25 | |
| NEW BALTIMORE 0.2 SE, NY US | 42940 | | | 0.36 | |
| NEW BALTIMORE 0.2 SE, NY US | 42934 | | | 0.22 | |
| NEW BALTIMORE 0.2 SE, NY US | 42930 | | | 0.23 | |
| NEW BALTIMORE 0.2 SE, NY US | 42929 | | | 1.62 | |
| NEW BALTIMORE 0.2 SE, NY US | 42925 | | | 0.78 | |
| NEW BALTIMORE 0.2 SE, NY US | 42924 | | | 0.49 | |
| NEW BALTIMORE 0.2 SE, NY US | 42917 | | | 0.76 | |
| NEW BALTIMORE 0.2 SE, NY US | 42914 | | | 0.14 | |
| NEW BALTIMORE 0.2 SE, NY US | 42910 | | | 0.17 | |
| NEW BALTIMORE 0.2 SE, NY US | 42906 | 6 | 2.04 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42892 | | | 1.22 | |
| NEW BALTIMORE 0.2 SE, NY US | 42887 | | | 0.58 | |
| NEW BALTIMORE 0.2 SE, NY US | 42886 | | | 0.12 | |
| NEW BALTIMORE 0.2 SE, NY US | 42885 | 6 | 1.29 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42874 | | | 0.39 | |
| NEW BALTIMORE 0.2 SE, NY US | 42869 | | | 1.07 | |
| NEW BALTIMORE 0.2 SE, NY US | 42865 | 4 | 1.19 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42861 | | | 0.86 | |
| NEW BALTIMORE 0.2 SE, NY US | 42860 | | | 0.15 | |
| NEW BALTIMORE 0.2 SE, NY US | 42858 | | | 0.23 | |
| NEW BALTIMORE 0.2 SE, NY US | 42857 | | | 1.7 | |
| NEW BALTIMORE 0.2 SE, NY US | 42851 | | | 0.22 | |
| NEW BALTIMORE 0.2 SE, NY US | 42850 | 5 | 0.65 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42845 | | | 0.16 | |
| NEW BALTIMORE 0.2 SE, NY US | 42836 | 31 | 4.57 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42801 | | | 0.15 | |
| NEW BALTIMORE 0.2 SE, NY US | 42792 | | | 1.03 | 0 |
| NEW BALTIMORE 0.2 SE, NY US | 42779 | | | 0.73 | 0.7 |
| NEW BALTIMORE 0.2 SE, NY US | 42776 | | | 0.38 | |
| NEW BALTIMORE 0.2 SE, NY US | 42775 | | | 0.15 | |
| NEW BALTIMORE 0.2 SE, NY US | 42774 | | | 0.44 | |
| NEW BALTIMORE 0.2 SE, NY US | 42760 | | | 0.67 | |

## Appendix A:  NOAA Precipitation Data Since 2015
### Events Exceeding 0.1 Inch

| NAME | DATE | DAPR | MDPR | PRCP | WESF |
|------|------|------|------|------|------|
| NEW BALTIMORE 0.2 SE, NY US | 42759 | | | 1.42 | |
| NEW BALTIMORE 0.2 SE, NY US | 42753 | | | 0.5 | |
| NEW BALTIMORE 0.2 SE, NY US | 42748 | | | 0.14 | |
| NEW BALTIMORE 0.2 SE, NY US | 42734 | | | 0.36 | |
| NEW BALTIMORE 0.2 SE, NY US | 42722 | | | 0.28 | |
| NEW BALTIMORE 0.2 SE, NY US | 42721 | | | 0.29 | |
| NEW BALTIMORE 0.2 SE, NY US | 42716 | | | 0.21 | |
| NEW BALTIMORE 0.2 SE, NY US | 42711 | | | 0.14 | |
| NEW BALTIMORE 0.2 SE, NY US | 42705 | | | 0.83 | |
| NEW BALTIMORE 0.2 SE, NY US | 42704 | | | 0.24 | |
| NEW BALTIMORE 0.2 SE, NY US | 42695 | | | 0.1 | 0.2 |
| NEW BALTIMORE 0.2 SE, NY US | 42694 | | | 0.5 | |
| NEW BALTIMORE 0.2 SE, NY US | 42690 | | | 1.64 | |
| NEW BALTIMORE 0.2 SE, NY US | 42671 | | | 0.85 | 0.9 |
| NEW BALTIMORE 0.2 SE, NY US | 42666 | | | 1.27 | |
| NEW BALTIMORE 0.2 SE, NY US | 42664 | | | 0.44 | |
| NEW BALTIMORE 0.2 SE, NY US | 42640 | | | 0.38 | |
| NEW BALTIMORE 0.2 SE, NY US | 42633 | 11 | 1.38 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42622 | | | 0.15 | |
| NEW BALTIMORE 0.2 SE, NY US | 42604 | | | 0.52 | |
| NEW BALTIMORE 0.2 SE, NY US | 42599 | 5 | 0.8 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42593 | | | 0.38 | |
| NEW BALTIMORE 0.2 SE, NY US | 42584 | | | 0.87 | |
| NEW BALTIMORE 0.2 SE, NY US | 42583 | | | 0.54 | |
| NEW BALTIMORE 0.2 SE, NY US | 42582 | | | 1.54 | |
| NEW BALTIMORE 0.2 SE, NY US | 42580 | | | 0.13 | |
| NEW BALTIMORE 0.2 SE, NY US | 42577 | | | 0.18 | |
| NEW BALTIMORE 0.2 SE, NY US | 42568 | | | 0.12 | |
| NEW BALTIMORE 0.2 SE, NY US | 42566 | | | 0.17 | |
| NEW BALTIMORE 0.2 SE, NY US | 42562 | | | 0.23 | |
| NEW BALTIMORE 0.2 SE, NY US | 42560 | | | 0.22 | |
| NEW BALTIMORE 0.2 SE, NY US | 42556 | | | 0.26 | |
| NEW BALTIMORE 0.2 SE, NY US | 42553 | | | 0.14 | |
| NEW BALTIMORE 0.2 SE, NY US | 42550 | | | 0.73 | |
| NEW BALTIMORE 0.2 SE, NY US | 42544 | 6 | 0.18 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42533 | | | 0.92 | |
| NEW BALTIMORE 0.2 SE, NY US | 42527 | | | 1.01 | |
| NEW BALTIMORE 0.2 SE, NY US | 42526 | | | 0.4 | |
| NEW BALTIMORE 0.2 SE, NY US | 42521 | | | 0.49 | |
| NEW BALTIMORE 0.2 SE, NY US | 42504 | | | 0.43 | |
| NEW BALTIMORE 0.2 SE, NY US | 42497 | | | 0.23 | |
| NEW BALTIMORE 0.2 SE, NY US | 42495 | | | 0.17 | |
| NEW BALTIMORE 0.2 SE, NY US | 42493 | | | 0.39 | |
| NEW BALTIMORE 0.2 SE, NY US | 42492 | | | 0.28 | |
| NEW BALTIMORE 0.2 SE, NY US | 42488 | 6 | 0.52 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42472 | | | 0.14 | |

## Appendix A:  NOAA Precipitation Data Since 2015
### Events Exceeding 0.1 Inch

| NAME | DATE | DAPR | MDPR | PRCP | WESF |
|------|------|------|------|------|------|
| NEW BALTIMORE 0.2 SE, NY US | 42468 | | | 0.44 | |
| NEW BALTIMORE 0.2 SE, NY US | 42466 | 7 | 0.56 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42458 | | | 0.28 | |
| NEW BALTIMORE 0.2 SE, NY US | 42446 | 8 | 0.38 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42431 | | | 0.18 | |
| NEW BALTIMORE 0.2 SE, NY US | 42426 | | | 0.42 | |
| NEW BALTIMORE 0.2 SE, NY US | 42425 | | | 2.54 | |
| NEW BALTIMORE 0.2 SE, NY US | 42417 | | | 0.81 | |
| NEW BALTIMORE 0.2 SE, NY US | 42416 | | | 0.38 | 0.4 |
| NEW BALTIMORE 0.2 SE, NY US | 42415 | 8 | 0.11 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42404 | | | 0.18 | |
| NEW BALTIMORE 0.2 SE, NY US | 42385 | | | 0.54 | |
| NEW BALTIMORE 0.2 SE, NY US | 42380 | | | 0.76 | |
| NEW BALTIMORE 0.2 SE, NY US | 42367 | | | 0.76 | 0.8 |
| NEW BALTIMORE 0.2 SE, NY US | 42366 | 6 | 0.78 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42356 | | | 0.25 | |
| NEW BALTIMORE 0.2 SE, NY US | 42353 | | | 0.39 | |
| NEW BALTIMORE 0.2 SE, NY US | 42341 | | | 0.3 | |
| NEW BALTIMORE 0.2 SE, NY US | 42340 | | | 0.29 | |
| NEW BALTIMORE 0.2 SE, NY US | 42328 | | | 0.52 | |
| NEW BALTIMORE 0.2 SE, NY US | 42321 | | | 0.12 | |
| NEW BALTIMORE 0.2 SE, NY US | 42320 | | | 0.12 | |
| NEW BALTIMORE 0.2 SE, NY US | 42319 | | | 1.2 | |
| NEW BALTIMORE 0.2 SE, NY US | 42306 | | | 1.68 | |
| NEW BALTIMORE 0.2 SE, NY US | 42305 | 5 | 0.26 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42287 | | | 0.2 | |
| NEW BALTIMORE 0.2 SE, NY US | 42278 | | | 1.68 | |
| NEW BALTIMORE 0.2 SE, NY US | 42277 | | | 3.42 | |
| NEW BALTIMORE 0.2 SE, NY US | 42260 | | | 2.41 | |
| NEW BALTIMORE 0.2 SE, NY US | 42258 | | | 0.76 | |
| NEW BALTIMORE 0.2 SE, NY US | 42239 | 5 | 0.95 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42232 | | | 0.23 | |
| NEW BALTIMORE 0.2 SE, NY US | 42231 | | | 0.23 | |
| NEW BALTIMORE 0.2 SE, NY US | 42228 | | | 0.52 | |
| NEW BALTIMORE 0.2 SE, NY US | 42227 | | | 0.53 | |
| NEW BALTIMORE 0.2 SE, NY US | 42221 | | | 0.39 | |
| NEW BALTIMORE 0.2 SE, NY US | 42214 | 6 | 0.18 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42195 | | | 0.81 | |
| NEW BALTIMORE 0.2 SE, NY US | 42193 | | | 0.15 | |
| NEW BALTIMORE 0.2 SE, NY US | 42190 | | | 0.23 | |
| NEW BALTIMORE 0.2 SE, NY US | 42186 | | | 0.77 | |
| NEW BALTIMORE 0.2 SE, NY US | 42184 | 10 | 2.19 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42170 | | | 0.98 | |
| NEW BALTIMORE 0.2 SE, NY US | 42168 | | | 0.37 | |
| NEW BALTIMORE 0.2 SE, NY US | 42167 | 9 | 1.8 | | |
| NEW BALTIMORE 0.2 SE, NY US | 42156 | | | 0.43 | |

## Appendix A:  NOAA Precipitation Data Since 2015
### Events Exceeding 0.1 Inch

| NAME | DATE | DAPR | MDPR | PRCP | WESF |
|------|------|------|------|------|------|
| NEW BALTIMORE 0.2 SE, NY US | 42155 | | | 0.3 | |
| NEW BALTIMORE 0.2 SE, NY US | 42152 | | | 0.42 | |
| NEW BALTIMORE 0.2 SE, NY US | 42144 | | | 0.3 | |
| NEW BALTIMORE 0.2 SE, NY US | 42140 | | | 0.11 | |
| NEW BALTIMORE 0.2 SE, NY US | 42117 | | | 0.13 | |
| NEW BALTIMORE 0.2 SE, NY US | 42115 | | | 0.54 | |
| NEW BALTIMORE 0.2 SE, NY US | 42104 | | | 0.39 | |
| NEW BALTIMORE 0.2 SE, NY US | 42103 | | | 0.63 | |
| NEW BALTIMORE 0.2 SE, NY US | 42098 | | | 0.52 | |
| NEW BALTIMORE 0.2 SE, NY US | 42090 | | | 0.41 | |

# <u>Appendix B</u>:

**JEREMY DIETRICH, *Physiochemical Characteristics of Runoff and Surface Waters of Lower Coeymans Creek*, IA ENVTL. (Jan. 28, 2020)**

  

# PHYSIOCHEMICAL CHARACTERISTICS OF RUNOFF AND SURFACE WATERS OF LOWER COEYMANS CREEK

## January 28, 2020

**For:**

**Hudson River Sloop Clearwater, Inc.**

**724 Wolcott Ave**

**Beacon, NY**

**By:**

**Jeremy Dietrich**

**IA Environmental**

**1022 Cayuga Heights Rd**            **600 Wolverine Way**

**Ithaca, NY 14850**            **Scotts Valley, CA 95066**

# TABLE OF CONTENTS

SECTION                                                              PAGE

INTRODUCTION: ..................................................................... 1

METHODS: ......................................................................... 2

RESULTS: ......................................................................... 3

CONCLUSIONS: ..................................................................... 4

REPORT TABLES: ................................................................... 5 - 9

REPORT FIGURES ................................................................... 10 - 11

## INTRODUCTION

A physiochemical surface water sampling effort was conducted along a longitudinal gradient on lower Coeymans Creek in Albany County, New York State, focused within a segment of the creek which flows thorough an industrial park.  Publicly available aerial imagery shows numerous points on the landscape surrounding lower Coeymans Creek which appear to be developed for industrial or commercial purposes such as processing or storage of bulk road salt, scrap metal, and electrical transformers.  The goal was to collect and analyze physiochemistry data within the mainstem of Coeymans Creek and any incoming tributaries or outfall points between NYS Thruway Route 87 and State route 144 during a heavy precipitation event.

This segment of Coeymans Creek is designated as a Class C (TS) water by DEC, where 'TS' designates trout spawning, as the Coeymans Creek watershed is annually stocked with brown trout (*Salmo trutta*) to provide recreational angling opportunities within Coyemans Creek (https://www.dec.ny.gov/outdoor/23338.html).  The trout-spawning designation provides an additional statutory layer of protection for the stream's water quality.  According to DEC regulations:

 *"Trout spawning waters are trout waters in which trout eggs can be deposited and be fertilized by trout inhabiting such waters (or connecting waters) and in which those eggs can develop and hatch, and the trout hatched therefrom could survive and grow to a sufficient size and stage of development to enable them to either remain and grow to adult trout therein, or migrate into and survive in other trout waters."* 6 NYCRR 700.1(68)

Furthermore, "trout waters" are defined as:

*"Trout waters are waters that provide habitat in which trout can survive and grow within a normal range on a year-round basis, or on a year-round basis excepting periods of time during which almost all of the trout inhabiting such waters could and would temporarily retreat into and survive in adjoining or tributary waters due to natural circumstances."* 6 NYCRR 700.1(67).

Natural tributaries entering Coeymans creek require the same level of environmental protection offered to a C(TS) stream, as they are "*connecting waters*" and trout would have the ability to *"temporarily retreat into and survive in adjoining or tributary waters due to natural circumstances."*  These tributaries need not be permanent to support these activities, as ephemeral tributaries may be suitable, depending on discharge regimes. 'Natural circumstances' as they relate to brown trout stocked in the Coeymans Creek watershed would commonly refer to fish seeking tributaries for thermal refuge and spawning activities. The latter may be applicable in lower Coeymans Creek during the time of sampling, as brown trout spawn in autumn months, often September-November.

New York State has established water quality standards and guidance values for various classifications of surface waters that include numeric criteria for many analytes and substances (https://www.dec.ny.gov/chemical/23853.html).

## METHODS

Surface water grab samples were collected from lower Coeymans Creek on October 7, 2019.  Over an inch of rain had fallen over Albany County over the time period between October 6 – 7, 2019 (https://www.usclimatedata.com/climate/albany/new-york/united-states/usny0011/2019/10), providing for adequate runoff event sampling conditions.  To access the lower portion of Coeymans Creek, a canoe-float was employed, which began at Old Ravena Rd and ended at Route 144.  Water quality parameters and/or grab samples were taken at 12 locations: four above the industrial park zone, seven within the industrial park zone, and one immediately downstream of the industrial park zone (Figures 1 & 2).  Specific collection location information and time of collection can be found in Table 1.

In-situ surface water physiochemical measurements of temperature, dissolved oxygen, pH, and conductivity were taken with a YSI Professional Plus handheld Multi-parameter instrument (https://www.ysi.com/proplus).  Grab samples taken from discrete outfall locations were collected with appropriate vessels and chemical preservatives as determined by the analyte or substance being tested, and in accordance with standard practices or analytical lab requirements.  A full list of measured analytes along with collection requirements, analytical method, and water quality standards can be found in Table 2.  For analytes whose toxicity is hardness dependent, Table 3 summarizes the chronic and acute toxicity levels for each collection site based on the hardness at time of collection.  Water hardness was calculated from section 2340-B of *Standard Methods for the Examination of Water and Wastewater* (2005).  All samples collected for laboratory analyses were kept on ice immediately after collection until delivery to the appropriate analytical laboratory.

Grab-samples for PCBs, Oil/Grease, and Chemical Oxygen Demand (COD) were submitted for analyses to Microbac Laboratories Inc., Cortland NY on October 7, 2019.  Grab samples for Chlorides, Mercury, and Total Suspended Solids (TSS) were submitted for analyses to Community Science Institute, Ithaca NY, on October 8, 2019.  Grab-samples for metals were submitted to the Cornell Nutrient Analysis Laboratory on October 8, 2019.

## RESULTS

Grab sample measurements for all sites can be reviewed in Tables 4 – 6.  Within the commercial/industrial zone of lower Coeymans Creek – between NYS thruway Route 87 and State route 144, numerous breaches of C(TS) water quality standards were observed from both incoming natural tributaries and outfalls directly emptying into the Coeymans Creek mainstem.

Tributaries sampled at sites 5,6, and 7 all possessed elevated chloride values.  While there is no stand-alone chloride standard or guidance value for Class C or TS waters, there is a total dissolved solids (TDS) standard of 500 mg/L.  Chloride is a major contributor to dissolved solids (https://www.usgs.gov/mission-areas/water-resources/science/chloride-salinity-and-dissolved-solids).  Therefore, if a sampling site exceeds 500mg/L of chloride, it also violates the TDS standard for Class C or TS waters.  Site 6 was the most egregious with a chloride reading of 42,050 mg/L, an exceedance of 83-times the TDS standard.  Sites 5 and 7 possessed a chloride value of 1,644mg/L and 1,925mg/L, respectively, exceeding the standard by 2.2 and 2.8 times the TDS standard, respectively.  Sodium is also a component of dissolved solids, and sites 5 and 6 possessed sodium values in exceedance of the TDs standard with 23,542mg/L and 699mg/L, respectively.  Additionally, tributary Site 6, also violated the dissolved oxygen standard (below 7.0mg/L) with a value of 5.73mg/L.   Furthermore, we observed unusually high Chemical Oxygen Demand (COD) within tributary 6 - 3,060mg/L-eight to ten times higher than other grab samples collected.

Outfall 10 within the industrial park area breached the TDS standard with an observed value of 900mg/L.  Outfall site 11 showed no unusual analyte values or exceedances.  Outfall site 9 measured elevated conductivity values (2,060µS/cm), but other in-situ values of DO, temperature, and pH were within normal bounds.  Site 9 flow was limited, and a great deal of sediment was built up in the pipe.  All other outfalls had robust flow resulting from the prior and existing precipitation event.

## CONCLUSIONS

Within the industrial park, both natural tributaries and man-made outfalls emptying directly into the Coeymans Creek mainstem possessed dissolved solids levels in exceedance of the numeric water quality criterion found in the surface water quality standard for Class-C waters (500 mg/L).  Within Tributary Site #6, observable water quality degradation in the form of low dissolved oxygen and high chlorides could impair or disrupt trout behavior.

All of these inputs, cumulatively, likely contribute to the ~18% increase in Coeymans Creek mainstem conductivity values observed between mainstem Site 4 (960 µS/cm) and mainstem Site 12 (1,130 µS/cm).  For comparison, this rate of increase over stream distance is 75% higher than observed conductivity increase between Old Ravena Rd and Site 4, prior to entrance into the industrial park area.

**_Table 1:  Collection location information for grab samples collected at Lower Coeymans Creek on October 7, 2019._**

| Collection Site | Time Collected | Easting UTM | Northing UTM | Sampling Location Description |
|---|---|---|---|---|
| #1 | 8:14 | 597945 | 4706493 | Coeymans Creek downstream of Old Ravena Rd |
| #2 | 8:29 | 598335 | 4706169 | Coeymans Creek at Coeymans WMA |
| #3 | 8:58 | 598088 | 4705589 | Outfall pipe at south drainage of cement plant |
| #4 | 9:34 | 598588 | 4704911 | Coeymans Creek upstream of industrial park |
| #5 | 9:59 | 598585 | 4704565 | Tributary draining the NW portion of industrial park |
| #6 | 10:24 | 598846 | 4704326 | Tributary draining western portion of industrial park |
| #7 | 10:46 | 598792 | 4704171 | Tributary draining western portion of industrial park |
| #8 | 10:51 | 598837 | 4704046 | Outfall:  30" pipe discharging into Coeymans Creek |
| #9 | 11:09 | 598938 | 4704056 | Outfall:  48" pipe discharging into Coeymans Creek |
| #10 | 11:25 | 599042 | 4703812 | Outfall:  30" pipe discharging into Coeymans Creek |
| #11 | 11:35 | 599072 | 4703747 | Outfall:  40" pipe discharging into Coeymans Creek |
| #12 | 12:30 | 599111 | 4703587 | Coeymans Creek upstream of State Route 144 |

**Table 2:  Analyte collection information, vessel requirements, and applicable surface water standards.**

| Analyte or Substance | Units of Measure | Collection Vessel | Analytical Method | Numeric Standard or Guidance Value for C(TS) Water[1] | Sites Collected |
|---|---|---|---|---|---|
| pH | - | Probe | In-Field | 6.50<pH<8.5 | 1-12 |
| Dissolved Oxygen | mg/L | Probe | In-Field | 7.0 | 1-12 |
| Conductivity | μS/cm | Probe | In-Field | none | 1-12 |
| $H_20$ Temperature | C | Probe | In-Field | >50F | 1-12 |
| COD | mg/L | 500lm LDPE[2] w/ $H_2SO_4$ | HACH 8000 | none | 4,5,6,8,10,11 |
| PCBs | μg/L | 1L amber glass | EPA 608.3 | 0.505 | 4,8,10,11 |
| Oil/Grease | mg/L | 1L glass w/ $H_2SO_4$ | EPA 1664A | 5.0 | 4-7,9-11 |
| Total Suspended Solids | mg/L | 500ml LDPE | Std Methods 2540-D | none | 4,5,6,8,10,11 |
| Chloride (Cl) | mg/L | 250ml LDPE | Std Methods 2122:4500-Cl | none | 4-8,10,11 |
| Hardness | mg/L | calculated | Std. Methods 2340-B | none | 1-12 |
| METALS | | | | | |
| Aluminum (Al) | mg/L | 500ml LDPE | EPA 3015-6010 | 0.100, ionic | 4-8,10,11 |
| Arsenic (As) | μg/L | " | " | 0.150 chronic, 0.340 acute | 4-8,10,11 |
| Barium (Ba) | mg/L | " | " | 1.00 | 4-8,10,11 |
| Beryllium (Be) | mg/L | " | " | 1.10 | 4-8,10,11 |
| Boron (B) | mg/L | " | " | 1.00 | 4-8,10,11 |
| Cadmium (Cd) | mg/L | " | " | *hardness dependent | 4-8,10,11 |
| Calcium (Ca) | mg/L | " | " | none | 4-8,10,11 |
| Chromium (Cr) | mg/L | " | " | *hardness dependent | 4-8,10,11 |
| Copper (Cu) | mg/L | " | " | *hardness dependent | 4-8,10,11 |
| Iron (Fe) | mg/L | " | " | none | 4-8,10,11 |
| Lead (Pb) | mg/L | " | " | *hardness dependent | 4-8,10,11 |
| Magnesium (Mg) | mg/L | " | " | none | 4-8,10,11 |
| Manganese (Mn) | mg/L | " | " | none | 4-8,10,11 |
| Mercury (Hg) | μg/L | 500ml LDPE w/ $HNO_3$ | EPA 245.2 | 0.77 chronic, 1.4 acute | 4,6,8,10,11 |
| Nickle (Ni) | mg/L | 500ml LDPE | EPA 3015-6010 | *hardness dependent | 4-8,10,11 |
| Phosphorus (P) | mg/L | " | " | none | 4-8,10,11 |
| Selenium (Se) | mg/L | " | " | 0.01 | 4-8,10,11 |
| Silver (Ag) | μg/L | " | " | 0.1, ionic | 4-8,10,11 |
| Sodium (Na) | mg/L | " | " | none | 4-8,10,11 |
| Zinc (Zn) | mg/L | " | " | *hardness dependent | 4-8,10,11 |

[1]: http://www.dec.ny.gov/docs/water_pdf/togs1112.pdf

[2]: Low-density polyethylene

***Table 3:  Toxicity standards for analytes which are hardness dependent.  Hardness was calculated from section 2340-B in Standard Methods for the Examination of Water and Wastewater (2005) as follows: Hardness = 2.497\*(Ca,mg/L) + 4.118\*(Mg,mg/L).  Abbreviations 'A(C)' and 'A(A)' refer to chronic and acute toxicities, respectively, where chronic impairs biological propagation and acute impairs life.***

| Site Number | Hardness mg/L | Cadmium (Cd) μg/L | | Chromium (Cr) μg/L | | Copper (Cu) μg/L | | Lead (Pb) μg/L | | Nickel (Ni) μg/L | | Zinc (Zn) μg/L | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | A(C) | A(A) | A(C) | A(A) | A(C) | A(A) | A(C) | A(A) | A(C) | A(A) | A(C) | A(A) |
| 1 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 3 | 787 | 10.6 | 39.3 | 401 | 3085 | 52.1 | 93.8 | 93 | 2409 | 819 | 7386 | 464 | 646 |
| 4 | 408 | 6.3 | 18.7 | 234 | 1800 | 29.7 | 50.4 | 36 | 939 | 422 | 3830 | 266 | 370 |
| 5 | 564 | 8.1 | 27.0 | 305 | 2349 | 39.2 | 68.5 | 58 | 1498 | 584 | 5297 | 350 | 487 |
| 6 | 879 | 11.5 | 44.6 | 439 | 3370 | 57.3 | 104 | 109 | 2816 | 909 | 8243 | 509 | 709 |
| 7 | 729 | 9.9 | 36.0 | 376 | 2896 | 48.8 | 87.2 | 84 | 2157 | 754 | 6837 | 435 | 605 |
| 8 | 491 | 7.3 | 23.1 | 272 | 2096 | 34.8 | 60.1 | 47 | 1227 | 509 | 4612 | 311 | 433 |
| 9 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 10 | 299 | 4.9 | 13.2 | 181 | 1393 | 22.7 | 37.6 | 23 | 598 | 309 | 2804 | 204 | 284 |
| 11 | 315 | 5.2 | 14.0 | 189 | 1458 | 23.8 | 39.6 | 25 | 648 | 327 | 2963 | 214 | 297 |
| 12 | - | - | - | - | - | - | - | - | - | - | - | - | - |

*Table 4:  Grab sample analyte results for non-metals, plus mercury collected from lower Coeymans Creek on October 7, 2019.  A dash indicates no sample was collected or measured from that site number and 'ND' indicates a sample was collected, but the measurement was a non-detect or below an accepted detection threshold.*

| Site Number | Temp. C | Cond. µS/cm | DO mg/L | pH | COD mg/L | PCBs µg/L | Oil/Grease mg/L | TSS mg/L | Chloride mg/L | Mercury µg/L |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 13.2 | 750 | 9.43 | 7.76 | - | - | - | - | - | - |
| 2 | 13.0 | 760 | 9.58 | 7.89 | - | - | - | - | - | - |
| 3 | 14.4 | 1,360 | 9.33 | 8.14 | - | - | - | - | - | - |
| 4 | 13.4 | 960 | 9.33 | 8.07 | ND | ND | ND | 8.5 | 63.3 | ND |
| 5 | 14.7 | 5,240 | 8.90 | 8.13 | 49.2 | - | ND | 18.0 | 1,644 | - |
| 6 | 15.1 | 10,320 | 5.73 | 7.56 | 3,060 | - | ND | 177 | 42,050 | ND |
| 7 | 14.4 | 6,870 | 8.66 | 7.97 | - | - | - | - | 1,925 | - |
| 8 | 14.4 | 1,900 | 9.28 | 8.12 | 30.8 | ND | ND | 34.0 | 301 | ND |
| 9 | 14.3 | 2,060 | 7.99 | 7.56 | - | - | ND | - | - | - |
| 10 | 14.9 | 3,420 | 9.18 | 8.02 | 56.0 | ND | ND | 176 | 900 | ND |
| 11 | 15.6 | 1,100 | 9.93 | 8.09 | 24.9 | ND | ND | 18.5 | 143 | ND |
| 12 | 13.3 | 1,130 | 10.42 | 8.13 | - | - | - | - | - | - |

*Table 5:  Grab sample analyte results for metals which don't require a hardness-dependent water quality standard collected from lower Coeymans Creek on October 7, 2019.  A dash indicates no sample was collected or measured from that site number and 'ND' indicates a sample was collected, but the measurement was a non-detect or below an accepted detection threshold.*

| Site Number | Aluminum (Al) mg/L | Arsenic (As) µg/L | Beryllium (Be) mg/L | Calcium (Ca) mg/L | Iron (Fe) µg/L | Magnesium (Mg) mg/L | Manganese (Mn) µg/L | Selenium (Se) mg/L | Silver (Ag) µg/L | Sodium (Na) mg/L |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | - | - | - | - | - | - | - | - | - | - |
| 2 | - | - | - | - | - | - | - | - | - | - |
| 3 | 0.13 | 0 | 0 | 192 | 3 | 74 | 14 | 0 | 0 | 22 |
| 4 | 0.15 | 0 | 0 | 114 | 23 | 29 | 0 | 0 | 0 | 33 |
| 5 | 0.19 | 0 | 0 | 144 | 44 | 49 | 13 | 0 | 0 | 699 |
| 6 | 0.10 | 0 | 0 | 176 | 332 | 106 | 1,096 | 0 | 0 | 23,542 |
| 7 | 0.15 | 0 | 0 | 203 | 42 | 53 | 25 | 0 | 0 | 880 |
| 8 | 0.16 | 0 | 0 | 120 | 65 | 46 | 3 | 0 | 0 | 192 |
| 9 | - | - | - | - | - | - | - | - | - | - |
| 10 | 0.30 | 0 | 0 | 93 | 132 | 16 | 300 | 0 | 0 | 129 |
| 11 | 0.20 | 0 | 0 | 77 | 48 | 29 | 28 | 0 | 0 | 54 |
| 12 | - | - | - | - | - | - | - | - | - | - |

**Table 6:  Grab sample analyte results for metals which require a hardness-dependent water quality standard collected from lower Coeymans Creek on October 7, 2019.  A dash indicates no sample was collected or measured from that site number and 'ND' indicates a sample was collected, but the measurement was a non-detect or below an accepted detection threshold**

| Site Number | Cadmium (Cd) µg/L | Chromium (Cr) µg/L | Copper (Cu) µg/L | Lead (Pb) µg/L | Nickel (Ni) µg/L | Zinc (Zn) µg/L |
|---|---|---|---|---|---|---|
| 1 | - | - | - | - | - | - |
| 2 | - | - | - | - | - | - |
| 3 | 0 | 0 | 2.0 | 0 | 0 | 0 |
| 4 | 0 | 0 | 2.0 | 0 | 0 | 0 |
| 5 | 0 | 0 | 12.0 | 0 | 4.0 | 0 |
| 6 | 1.0 | 0 | 7.0 | 0 | 0 | 8.0 |
| 7 | 0 | 0 | 4.0 | 0 | 0 | 0 |
| 8 | 0 | 0 | 4.0 | 0 | 0 | 0 |
| 9 | - | - | - | - | - | - |
| 10 | 0 | 0 | 10.0 | 0 | 0 | 2.0 |
| 11 | 0 | 0 | 3.0 | 0 | 0 | 0 |
| 12 | - | - | - | - | - | - |



***Figure 1:  Location of lower Coeymans creek grab-sample collection effort in Albany County, New York State, conducted on October 7, 2019.***



*Figure 2:  Location grab-samples collected within the Industrial area of lower Coeymans Creek on October 7, 2019.*